MICHAEL J. KHOURI, ESQ. [CASBN 97654]
KHOURI LAW FIRM, APC
24012 Calle De La Plata, Suite 210
Laguna Hills, California 92653
Telephone:     (949) 336-2433
Fax:               (949) 387-0044
E-mail:  mkhouri@khourilaw.com


Attorneys for Plaintiff, SADEK RAOUF EBEID, M.D.


UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SADEK RAOUF EBEID, M.D.,<br><br>                                Plaintiff,<br><br>        vs.<br><br>FACEBOOK, INC.,<br><br>                                Defendant. | Case No. 4:18-cv-07030-PJH<br><br>**PLAINTIFF SADEK RAOUF EBEID, M.D.'S OPPOSITION TO DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS COMPLAINT, SPECIAL MOTION TO STRIKE AND FOR ATTORNEY'S FEES AND COSTS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:            May 1, 2019<br>Time:           9:00 a.m.<br>Judge:          Hon. Phyllis J. Hamilton<br>Dept.:          Courtroom 3<br><br>Date Filed:   November 19, 2018<br><br>Trial Date:   Not Set |

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................... 1

I.      INTRODUCTION AND STATEMENT OF ISSUES ........................................................ 1

II.     STATEMENT OF RELEVANT FACTS ........................................................................... 2

III.    ARGUMENT ...................................................................................................................... 3

      A.      The Immunity Provided for in 47 U.S.C. § 230(c)(1) Does Not Apply to the
            Present Matter ......................................................................................................... 4

            1.      Majority of the Authority Relied Upon by Facebook in its Motion to
                   Dismiss are Distinguishable from the Present Matter, as the Plaintiff is not
                   Alleging Liability for Information Provided by Someone Other Than
                   Facebook ....................................................................................................... 5

            2.      *Sikhs* and *Lancaster* Were Wrongly Decided as They Go Against the
                   Existing Case Law's Application of the CDA Immunity Statute ................ 6

      B.      Not Only Facebook's Discriminatory Actions Towards the Plaintiff Are Not
            Protected by the First Amendment, But These Actions Are in Violation of The
            Plaintiff's First Amendment Rights ....................................................................... 8

            1.      The First Amendment Does Not Shield Facebook from Liability for
                   Violation of Anti-Discrimination Laws or Violation of Other Content-
                   Neutral Laws of General Applicability ....................................................... 8

            2.      By Regulating Free Speech in a Public Forum, Facebook is Engaging in a
                   Traditional Public Function and Thus Within the Purview of First
                   Amendment Protection ............................................................................... 10

      C.      This Court Should Consider Facebook as a Place of Public Accommodation
            Under 42 U.S.C. § 2000a ..................................................................................... 11

      D.      Plaintiff has Plead Sufficient Facts to Support Relief Under California's Unruh

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT, SPECIAL MOTION
TO STRIKE AND FOR ATTORNEY'S FEES AND COSTS
Case No. 4:18-cv-07030-PJH

Civil Rights Act...............................................................................................15

    1.    The Plaintiff's State of Residence Is Immaterial Because the Alleged

        Discriminatory Actions Occurred in California .........................................16

    2.    Plaintiff Has Sufficiently Alleged Intentional Discrimination by Facebook

        ...................................................................................................................17

E.    Plaintiff has Sufficiently Plead the Breach of Contract Cause of Action..............18

F.    Plaintiff has sufficiently plead the Breach of Covenant of Good Faith and Fair

    Dealing Cause of Action........................................................................................20

G.    Plaintiff has Sufficiently Plead the Fraud/Intentional Misrepresentation Cause of

    Action....................................................................................................................21

H.    Plaintiff has Sufficiently Plead the Unlawful Business Practices Cause of Action

    ...............................................................................................................................22

I.    Should the Court Find the Complaint Insufficient, Plaintiff Requests That the

    Court Grant Him Leave to Amend.........................................................................23

J.    Facebook's Request for Dismissal and Attorney's Fees Under the California Anti-

    SLAPP Statute Must Fail.......................................................................................23

    1.    Plaintiff's Causes of Action Under the Unruh Act and UCL Do Not Arise

        from a Protected Activity .........................................................................24

    2.    Plaintiff has Sufficiently Demonstrated a probability of Prevailing On the

        Asserted Claims ......................................................................................24

IV.    CONCLUSION.................................................................................................................25

ii

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT, SPECIAL MOTION
TO STRIKE AND FOR ATTORNEY'S FEES AND COSTS
Case No. 4:18-cv-07030-PJH

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*ACLU of Nev. v. City of Las Vegas,*
   333 F.3d 1092 (9th Cir. 2003) ……………………………………………………10

5

6

*Arcara v. Cloud Books, Inc.,*
   478 U.S. 697, 705(1986) …………………………………………………………...9

7

8

*Ashcroft v. Iqbal,*
   556 U.S. 662, 678 (2009) …………………………………………………………3

9

10

*Barnes v. Yahoo!, Inc.,*
   570 F.3d 1096, 1098-1099 (9th Cir. 2009) …………………………………………6

11

12

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544, 570 (2007) ……………………………………………………………3

13

*Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC,*
   859 F.Supp.2d 1138 (E.D.Cal. 2012) …………………………………………….20

14

15

*Biggins v. Wells Fargo & Co.,*
   266 F.R.D. 399 (N.D.Cal. 2009) …………………………………………………..21

16

17

*Boos v. Barry,*
   485 U.S. 312 (1988) ………………………………………………………………10

18

19

*Carparts Distrib. Ctr. v. Auto. Wholesaler's Ass'n,*
   37 F.3d 12 (1st Cir. 1994) ……………………………………………………13, 15

20

*Cmty. Hosp. of the Monterey Peninsula v. Aetna Life Ins. Co.,*
   119 F. Supp. 3d 1042 (N.D.Cal. 2015) …………………………………………...19

21

22

*Doe v. Mut. of Omaha Ins. Co.,*
   179 F.3d 557 (7th Cir. 1999) ……………………………………………………14

23

24

*Elane Photography v. Willock,*
   309 P.3d 53 (2013) ………………………………………………………………...9

25

26

*Fair Hous. Council v. Roommates.com, LLC,*
   521 F.3d 1157, 1163 (9th Cir. 2008) ………………………………….4, 5, 6, 7, 8

27

*Fidelity Financial Corp. v. Federal Home Loan Bank,*
   792 F.2d 1432 (9th Cir. 1986) ……………………………………………………3

28

iii

*George v. Pacific-CSC Work Furlough,*
    91 F.3d 1227 (9th Cir. 1996) ……………………………………………11

*Greater L.A. Agency on Deafness, Inc. v. CNN, Inc.,*
    742 F.3d 414 (9th Cir. 2014) ……………………………………………17

*Hurley v. Irish-American Gay,*
    515 U.S. 557 (1995) ………………………………………………………9

*Klayman v. Zuckerberg,*
    410 U.S. App. D.C. 187, 190 (2014) ………………………………………4, 6

*Lancaster v. Alphabet Inc.,*
    2016 U.S.Dist.LEXIS 88908 (N.D.Cal. July 8, 2016) ………………………6, 7

*Lee v. Katz,*
    276 F.3d 550 (9th Cir. 2002) ……………………………………………11

*Lopez v. Smith,*
    203 F.3d 1122 (9th Cir. 2000) ……………………………………………23

*Marble Bridge Funding Group, Inc. v. Euler Hermes Am. Credit Indem. Co.,*
    225 F. Supp. 3d 1034 (N.D.Cal. 2016) …………………………………...21

*Mendiondo v. Centinela Hosp. Med. Ctr.,*
    521 F.3d 1097, 1104 (9th Cir. 2008) ………………………………………4

*Miami Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo,*
    418 U.S. 241 (1974) ………………………………………………………9

*Nat'l Ass'n of the Deaf v. Netflix, Inc.,*
    869 F.Supp.2d 196 (D.Mass. 2012) ………………………………………14

*Nat'l Fed'n of the Blind v. Target Corp.,*
    452 F.Supp.2d 946 (N.D.Cal. 2006) ………………………………………13

*PGA Tour, Inc. v. Martin,*
    532 U.S. 661 (2001) ………………………………………………………13

*R. A. V. v. St. Paul,*
    505 U.S. 377, 390 (1992) …………………………………………………9

*Riggs v. MySpace, Inc.,*
    444 F. App'x 986, 987 (9th Cir. 2011) ……………………………………6

iv

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT, SPECIAL MOTION
TO STRIKE AND FOR ATTORNEY'S FEES AND COSTS
Case No. 4:18-cv-07030-PJH

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47, 62 (2006) ……………………………………………………………..8

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
    144 F. Supp. 3d 1088 (N.D.Cal. 2015) ………………………………………6, 7, 8

*Sousanis v. Northwest Airlines, Inc.*,
    2000 U.S.Dist.LEXIS 23607 (N.D.Cal. Mar. 3) ……………………………   16, 17

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994) …………………………………………………………….9, 10

*United States v. Kokinda*,
    497 U.S. 720, 737 (1990) ……………………………………………………….10

*Verizon Del., Inc. v. Covad Communs. Co.*,
    377 F.3d 1081 (9th Cir. 2004) …………………………………………………..25

*Warner v. Tinder Inc.*,
    105 F. Supp. 3d 1083 (C.D.Cal. 2015) …………………………………………17

*Way v. JP Morgan Chase Bank, N.A.*,
    2018 U.S.Dist.LEXIS 77622 (E.D.Cal. May 7, 2018) ………………………….20

*Weyer v. Twentieth Century Fox Film Corp.*,
    198 F.3d 1104 (9th Cir. 2000) …………………………………………………..13

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327, 330-331 (4th Cir. 1997) …………………………………….5, 6

**State Cases**

*Beckwith v. Dahl*,
    205 Cal.App.4th 1039 (2012) …………………………………………………..22

*Braun v. Chronicle Publishing Co.*,
    52 Cal.App.4th 1036 (1997) …………………………………………………….23

*Castleman v. Sagaser*,
    216 Cal.App.4th 481 (2013) …………………………………………………23, 24

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
    20 Cal.4th 163 (1999) …………………………………………………………..22

*City of Cotati v. Cashman*,
    29 Cal.4th 69 (2002) ……………………………………………………………24

v

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT, SPECIAL MOTION
TO STRIKE AND FOR ATTORNEY'S FEES AND COSTS
Case No. 4:18-cv-07030-PJH

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Diamond Woodworks, Inc. v. Argonaut Ins. Co.*,
    109 Cal.App.4th 1020 (2003) ………………………………………………22

*Engalla v. Permanente Medical Group, Inc.*,
    15 Cal.4th 951 (1997) ………………………………………………..21

*Flowers v. Prasad*,
    238 Cal.App.4th 930 (2015) ………………………………………………17

*Martin v. Inland Empire Utilities Agency*,
    198 Cal.App.4th 611 (2011) ………………………………………………24

*O'Connor v. Village Green Owners Assn.*,
    33 Cal.3d 790 (1983) ………………………………………………...16

*Oasis West Realty, LLC V. Goldman*,
    51 Cal.4th. 811 (2011)………………………………………………24

*Park v. Board of Trustees of California State University*,
    2 Cal.5th 1057 (2017) ………………………………………………24

*Sullivan v. Oracle Corp.*,
    51 Cal.4th 1191 (2011) ………………………………………………16

*Winchell v. English*,
    62 Cal.App.3d 125 (1976) ………………………………………………17

**Federal Statutes**

Americans with Disabilities Act of 1990 Title III, 42 U.S.C. § 12181…………………13, 14, 15

Civil Rights Act of 1964 Title II, 42 U.S.C. § 2000a……………………………7, 11, 12, 13, 15

Communications Decency Act …………………………………………………………..4, 5, 6, 7, 8

**State Statutes**

California's Unruh Civil Rights Act, Cal. Civ. Code § 51(b) …………………………15

California Code of Civil Procedure § 425.16…………………………………………23, 24

Cal. Bus. & Prof. Code, § 17200 …………………………………………………22

**Other**

Tara Thompson, *COMMENT: Locating Discrimination: Interactive Web Sites as Public Accommodations under Title II of the Civil Rights Act,*
        2002 U Chi Legal F 409, 432………………………………………………………..14

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT, SPECIAL MOTION
TO STRIKE AND FOR ATTORNEY'S FEES AND COSTS
Case No. 4:18-cv-07030-PJH

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.      INTRODUCTION AND STATEMENT OF ISSUES**

3        In his Complaint, Plaintiff Sadek Raouf Ebeid, M.D. ("Plaintiff") alleges that defendant

4    Facebook, Inc. ("Facebook") has engaged in a series of discriminatory actions against him in

5    various forms since 2017.  Particularly, the Complaint alleges five methods used by Facebook to

6    discriminate against the Plaintiff: (1) Limiting Plaintiff's access to his public page; (2) Limiting

7    and restricting others from engaging in Plaintiff's campaign; (3) Restricting the Plaintiff from

8    joining or posting on any Facebook Groups; (4) Repeatedly removing the Plaintiff's posts by

9    arbitrarily identifying them as spam; and (5) Misrepresentations as to boosting Plaintiff's posts.

10   Based on these actions by Facebook, Plaintiff alleges that Facebook discriminated against him in

11   violation the United States Civil Rights Act and the California Unruh Civil Rights Act.  The

12   Plaintiff also alleges that the methods used by Facebook in carrying out the discrimination give

13   rise to causes of action for fraud/intentional misrepresentation, breach of contract, breach of

14   implied covenant of good faith and fair dealing, unlawful business practices, and that such

15   arbitrary actions are in violation of Plaintiff's First Amendment right to free speech and

16   association.

17       On January 18, 2019, Facebook filed a motion to dismiss the Complaint with prejudice

18   under Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss"), moved for an order

19   striking Plaintiff's third and seventh causes of action pursuant to section 425.16 of the California

20   Code of Civil Procedure ("Anti-SLAPP Statute"), and an order for attorney's fees in relation to

21   the Anti-SLAPP motion.

22       The Court should deny Facebooks Motion to Dismiss because the immunity provided for

23   in 47 U.S.C. § 230(c)(1) does not apply to the present matter, and the Complaint pleads sufficient

24   facts to support all causes of action alleged, pursuant to Federal Rule of Civil Procedure 8(a).

25   Furthermore, should the Court find the Complaint insufficient in any manner, the Plaintiff can

26   address such deficiencies by amending the Complaint.

27       The Court should also deny Facebook's Anti-SLAPP motion and request for attorney's

28

1    fees because the causes of actions alleged in the Complaint do not arise from a protected activity.

2    **II.    STATEMENT OF RELEVANT FACTS**

3          Plaintiff, who is of Egyptian national origin, created a public page on Facebook titled

4    "Egypt-Cradle of Love" ("ECL"), the purpose of which was to promote religious tolerance and

5    the mutual acceptance of people of all faiths in Egypt and the Middle East.  Dkt. No. 1

6    ("Complaint") ¶¶ 10, 13.  Since creating the ECL page in 2010, Plaintiff has spent approximately

7    twenty hours per week and a significant amount of funds in promoting the ECL page through

8    content creation and use of Facebook's "boosting" advertisement feature.  Complaint ¶ 14.

9    Plaintiff's labor and financial investment in the ECL page has attracted more than 450,000

10   followers and approximately 18 million readers since the page's inception.  *Id.* ¶ 13.

11         In early 2017, Plaintiff started a campaign to recall the then British Ambassador in Egypt

12   on the ECL page.  *Id.* ¶ 16.  Given the demographic, the majority of Plaintiff's posts were in

13   Arabic and targeted towards Facebook users in Egypt.  *Id.* ¶ 14.  Facebook's discriminatory

14   actions began as the campaign gained popularity.  *Id.* ¶ 17.  Facebook carried out this

15   discrimination in various methods, all with the common goal of preventing the Plaintiff from

16   using Facebook's public forum to promote his campaign and grow the ECL page.  *Id.*  The

17   alleged discrimination is not limited to Facebook's removal of Plaintiff's posts, or denying

18   Plaintiff's requests to boost a post, as Facebook argues in its Motion to Dismiss.  *See* Dkt. No. 11

19   ("Motion to Dismiss") 2:16-18.  Instead, Facebook repeatedly suspended or restricted the

20   Plaintiff's personal account that he used to administer the ECL page, and even suspended or

21   terminated other users' accounts who were administrators of the ECL page.  Complaint ¶¶ 18-21.

22   Facebook also interfered with the Plaintiff's ability to promote the ECL page and his campaign

23   by chastising other users for sharing posts from the ECL page and participating in the Plaintiff's

24   campaign.  *Id.*  ¶¶ 24-27.  For example, numerous users who associated with the Plaintiff by

25   means of the ECL page or the Friends of Ebeid Group, including Ben Barrack, an American

26   journalist, were denied access to their personal accounts until they removed posts shared from

27   the ECL page.  *Id.*  Between September 2017 through February 2018, Facebook restricted the

28

1   Plaintiff from joining, or posting on, any Facebook group pages 16 times. *Id.* ¶ 28.  During the

2   same period, Facebook removed multiple posts by the Plaintiff, majority of which were in

3   Arabic, by identifying them as spam, even though none violated Facebook's community

4   standards. *Id.* ¶¶ 29-32.  The posts were arbitrarily removed as evidenced by the fact that on

5   multiple occasions, Facebook responded to Plaintiff's complaint about the removal by stating

6   "[w]e took another look and found it doesn't go against our Community Standards, so we've

7   restored your post," only to remove another similar post as "spam" mere days later. *Id.* ¶ 33.

8   Finally, on multiple occasions, Facebook reviewed and approved the Plaintiff's posts for

9   boosting, and notified the Plaintiff that the posts were in fact being boosted.  However, based on

10  past experiences, it was evident that the posts were not being boosted, and Facebook's

11  notification to the contrary was false. *Id.* ¶¶ 37-38

12  **III.    ARGUMENT**

13          Defendant Facebook filed the present Motion to Dismiss under Federal Rules of Civil

14  Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."  Pertinent to

15  this motion, Rule 8(a) of the Federal Rules of Civil Procedure provides that a complaint must

16  contain "a short and plain statement of the claim showing the pleader is entitled to relief."

17  Courts will deny a motion to dismiss unless "it appears to a certainty that [plaintiff] would be

18  entitled to no relief under any state of facts that could be proved."  *Fidelity Financial Corp. v.*

19  *Federal Home Loan Bank,* 792 F.2d 1432, 1435 (9th Cir. 1986).  To overcome a Motion to

20  Dismiss under Rule 12(b)(6), it is sufficient if the complaint pleads "enough facts to state a claim

21  to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

22  Where sufficient facts are plead, "a court should assume their veracity and then determine

23  whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679

24  (2009).  According to the Supreme Court, "[t]he plausibility standard is not akin to a probability

25  requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."

26  *Id.* at 678 (internal quotation marks omitted).  Accordingly, "[d]ismissal under Rule 12(b)(6) is

27  appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to

28

support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

As discussed below, Plaintiff has plead sufficient facts in the Complaint to overcome Facebook's Motion to Dismiss.

## A. The Immunity Provided for in 47 U.S.C. § 230(c)(1) Does Not Apply to the Present Matter

Section 230 of the United States Code titled "protection for private blocking and screening of offensive material" (hereinafter "CDA Immunity") provides in pertinent part: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Facebook is claiming immunity under this subdivision of section 230. However, in light of the allegations in the Complaint, Facebook's reliance on the CDA Immunity statute is misplaced.

The CDA Immunity statute was enacted in response to an unpublished state court decision in *Stratton Oakmont v. Prodigy Servs. Co.,* in which the Court held the defendant liable for a libelous message posted by a third party on one of defendant's financial message boards. *Fair Hous. Council v. Roommates.com, LLC,* 521 F.3d 1157, 1163 (9th Cir. 2008). The *Stratton Oakmont* decision was against public policy because it would hold online service providers who voluntarily filtered objectionable messages liable for all messages transmitted by third parties, while allowing providers who decided to bury their heads in the sand and ignore problematic posts altogether to escape liability. *Id.* By enacting the CDA Immunity Statute, "Congress sought to spare interactive computer services this grim choice by allowing them to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." *Id.* Accordingly, CDA Immunity requires dismissal of the complaint where (i) the defendant is a provider or user of an interactive computer service, (ii) *the information for which the plaintiff seeks to hold the defendant liable* was information provided by another information content provider, and (iii) the complaint seeks to hold the defendant liable as the publisher or speaker *of that information. Klayman v.*

1   *Zuckerberg,* 410 U.S. App. D.C. 187, 190 (2014) (emphasis added).

2         Plaintiff does not dispute that Facebook is a provider or user of an interactive computer

3   service. However, although the information discussed in the Complaint was provided by the

4   Plaintiff, the Plaintiff is not seeking to hold Facebook liable for the information, nor is the

5   Plaintiff attempting to hold Facebook liable as the publisher or speaker of the information.

6   Instead, the Complaint seeks to hold Facebook liable for discrimination against the Plaintiff

7   based on language, national origin, and political view. *See* Complaint ¶¶ 10, 30, 32, 34.

8   Accordingly, CDA Immunity does not apply to the present matter.

9                    1.   <u>Majority of the Authority Relied Upon by Facebook in its Motion to
                          Dismiss are Distinguishable from the Present Matter, as the Plaintiff is</u>

10                        <u>not Alleging Liability for Information Provided by Someone Other Than
                          Facebook</u>

11

12         In analyzing the CDA Immunity Statute, the Ninth Circuit stated that "[i]ndeed, the

13   section is titled Protection for good samaritan blocking and screening of offensive material and,

14   … the substance of section 230(c) can and should be interpreted consistent with its caption."

15   *Fair Hous. Council*, 521 F.3d at 1163-1164. The Fourth Circuit also said the following in regards

16   to the CDA Immunity Statute: "None of this means, of course, that *the original culpable party*

17   *who posts defamatory messages* would escape accountability… Congress made a policy choice,

18   however, not to deter harmful online speech through the separate route of imposing tort liability

19   on companies that serve as intermediaries *for other parties' potentially injurious messages*."

20   *Zeran v. Am. Online, Inc.* 129 F.3d 327, 330-331 (4th Cir. 1997) (emphasis added).

21         Unlike in *Zeran,* the Plaintiff in the present matter is not attempting to hold Facebook

22   liable for some defamatory or unlawful statement made by another on Facebook's public forum.

23   This key distinction distinguishes the present matter from the majority of authority relied upon

24   by Facebook in which the plaintiff's cause of action arose from defamatory or unlawful

25   information authored by a third party.  In *Zeran,* the plaintiff was seeking to hold the defendant

26   liable for messages posted by an unidentified person on defendant's online bulletin board,

27   advertising tasteless slogans related to the bombing of the Alfred P. Murrah Federal Building in

28

1   Oklahoma City.  *Id.* at 329.  In *Fair Hous. Council,* the plaintiff was seeking to hold the

2   defendant liable for discriminatory and unlawful statements posted by third parties in the

3   "Additional Comments" section of defendant's website.  521 F.3d. at 1173.  In *Barnes v. Yahoo!,*

4   *Inc.*, the defendant's liability as alleged was based on defendant's promise to remove an indecent

5   profile containing disparaging statements and nude photographs of the plaintiff, created by the

6   plaintiff's ex-boyfriend. 570 F.3d 1096, 1098-1099 (9th Cir. 2009).  In *Klayman v. Zuckerberg*,

7   the plaintiff's complaint alleged that due to defendant's failure to remove a page containing anti-

8   Semitic messages, defendant should be held liable as furthering such messages.  410 U.S. App.

9   D.C. 187, 191 (2014).  Finally, in *Riggs v. MySpace, Inc.* the plaintiff who had her own unlawful

10  fake celebrity page removed, attempted to hold the defendant liable for not removing other fake

11  celebrity pages.  444 F. App'x 986, 987 (9th Cir. 2011).

12          The courts' decisions in all of the above cases were consistent with the policy behind the

13  CDA Immunity Statute, as in all of these cases the plaintiffs were attempting to hold the

14  defendants liable for unlawful information provided by a third party, similar to allegations in

15  *Stratton Oakmont* which prompted Congress' decision to enact the CDA Immunity Statute.

16  However, the present matter does not arise from the content of information provided by a third

17  party.  There is no original culpable party providing unlawful information on Facebook's public

18  platform.  In fact, the Plaintiff believes that the posts removed by Facebook for discriminatory

19  reasons were not objectionable in any manner, as he himself authored many of them. *See*

20  Complaint ¶¶ 18, 29-32.  Accordingly, although Facebook is a provider or user of an interactive

21  computer service, the Plaintiff is not seeking to hold Facebook liable as the publisher of some

22  unlawful information provide by a third party, and thus the CDA Immunity does not shield

23  Facebook from liability.

                2.   <u>*Sikhs* and *Lancaster* Were Wrongly Decided as They Go Against the
24                        Existing Case Law's Application of the CDA Immunity Statute</u>

25  Facebook cites to the District Court decisions in *Sikhs for Justice "SFJ", Inc. v.*

26  *Facebook, Inc.*144 F. Supp. 3d 1088 (N.D.Cal. 2015), and *Lancaster v. Alphabet Inc.* 2016

27

28

1  U.S.Dist.LEXIS 88908 (N.D.Cal. July 8, 2016), in arguing that the CDA Immunity Statute bars

2  the Plaintiff's Complaint.  The court in *Lancaster* reached its decision by relying on the District

3  Court's decision in *Sikhs*.  *Id.* at 7 (stating that "Under the three-prong test articulated in *Sikhs*

4  *for Justice*, Plaintiff cannot assert a claim based on Defendants' removal of her videos).  In the

5  interest of brevity, the below analysis of the District Court's decision in *Sikhs* is equally

6  applicable to the court's decision in *Lancaster*.

7       In *Sikhs*, the plaintiff's complaint, alleged discrimination by defendant Facebook for

8  blocking the plaintiff's page in India.  *Sikhs for Justice "SFJ", Inc.* 144 F. Supp. 3d at 1090. The

9  District Court, relying on precedent stated:

10      Thus, the CDA bars Plaintiff's Title II claim if: (1) Defendant is a "provider or user of an
        interactive computer service;" (2) the information for which Plaintiff seeks to hold
11      Defendant liable is "information provided by another information content provider;" and
        (3) Plaintiff's claim seeks to hold Defendant liable as the "publisher or speaker" of that
12      information.

13      *Id.* at 1092-1093 (internal citation omitted).

14      However, in applying the above standard to the case, the District Court circumvented the

15  most important aspect of the test: *the information for which Plaintiff seeks to hold Defendant*

16  *liable* is information provided by another information content provider; and Plaintiff's claim

17  seeks to hold Defendant liable as the publisher or speaker *of that information*.  The District Court

18  mistakenly boiled down the test to: (1) Interactive Computer Service, (2) Information Provided

19  by Another Information Content Provider; and (3) Treatment as a Publisher.  *Id.* at 1093-1096.

20  Thus, the District Court finding that Facebook is an interactive content provider, the content was

21  provided by a third party, and removing the page is a traditional publisher function, dismissed

22  the plaintiffs action with prejudice as being bared by the CDA Immunity Statute.  *Id.*  However,

23  in analyzing the elements in isolation, the District Court failed to take note of the fact that

24  although the information was provided by a third party, the information itself did not give rise to

25  plaintiff's causes of action, as was the case in the precedent relied upon by the District Court.

26      The District Court's holding was in direct contrast with the Ninth Circuit's decision in

27  *Fair Hous. Council,* stating that a defendant's actions which are deemed unlawful during face-to-

28

---

1   face or telephonic interactions, don't magically become lawful merely because they occur

2   electronically online.  *Fair Hous. Council*, 521 F.3d at 1164.  As the Ninth Circuit so aptly put:

3   "The Communications Decency Act was not meant to create a lawless no-man's-land on the

4   Internet."  *Id.*  The District Court's holding in *Sikhs* does just that; it wrongfully expands

5   Congress' intended CDA Immunity from cases where the plaintiff is attempting to hold an

6   interactive computer service provider *liable for unlawful* information provided by a third party,

7   to immunity for *any unlawful action by* an interactive computer service provider so long as it

8   somehow *relates* to information provided by a third party.

9          In evaluating Facebook's CDA Immunity defense in the present matter, it would be

10   prejudicial error for the Court to dismiss the Plaintiff's Complaint, as the District Court did in

11   *Sikh*, because the Plaintiff does not allege that Facebook is liable for unlawful information

12   provided by a third party, nor is it treating Facebook as the publisher of some unlawful

13   information provided by a third party.  The Complaint simply alleges that Facebook's own

14   discriminatory actions, independent of any third-party information, was unlawful, and thus, the

15   CDA Immunity does not apply to the present matter.

16          **B. Not Only Facebook's Discriminatory Actions Towards the Plaintiff Are Not
              Protected by the First Amendment, But These Actions Are in Violation of**
17          **The Plaintiff's First Amendment Rights**

18                  1.  The First Amendment Does Not Shield Facebook from Liability for
                        Violation of Anti-Discrimination Laws or Violation of Other Content-
19                      Neutral Laws of General Applicability

20          Facebook's argument that under the First Amendment, it cannot be held liable based on

21   Plaintiff's allegations in the Complaint completely misses the mark.  It is true that under the First

22   Amendment, the government may not restrict speech because of its content, nor can it compel

23   speech based on its content.  *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,

24   547 U.S. 47, 62 (2006).  However, this protection does not absolve Facebook of liability for

25   discriminatory actions against the Plaintiff, because "it has never been deemed an abridgment of

26   freedom of speech or press to make a course of conduct illegal merely because the conduct was

27   in part initiated, evidenced, or carried out by means of language, either spoken, written, or

28

printed." *Id.* (internal citation and quotation marks omitted).  "[N]either the press nor booksellers may claim special protection from governmental regulations of general applicability simply by virtue of their First Amendment protected activities." *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 705 (1986).

The Supreme Court has held that laws pertaining to public accommodations "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments." *Hurley v. Irish-American Gay*, 515 U.S. 557, 580 (1995); *See also Elane Photography v. Willock,* 309 P.3d 53, 59 (2013) (holding that content neutral laws of general applicability prohibiting discrimination against protected classes of people do not violate the First Amendment).  Accordingly, where the law in question "does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express [an] idea or philosophy. *R. A. V. v. St. Paul,* 505 U.S. 377, 390 (1992).

In the present matter, Plaintiff's complaint arises from discriminatory actions taken by Facebook against the Plaintiff in violation of the United States and California Civil Rights Acts, as well as other general content neutral laws.  The First Amendment does not provide Facebook with a free pass to discriminate based on race, national origin, and language, nor does it absolve Facebook from liability based on content neutral contract and tort laws, simply because Facebook's speech may be incidentally burdened.  The Supreme Court articulated the distinction between content neutral and content specific laws under the First Amendment in *Turner Broad. Sys. v. FCC,* 512 U.S. 622 (1994).  Specifically, the Court distinguished its decision in *Miami Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo*, 418 U.S. 241 (1974), from cases involving content neutral laws by stating that the "statute at issue in *Tornillo* required any newspaper that assailed a political candidate's character to print, upon request by the candidate and without cost, the candidate's reply in equal space and prominence.  Although the statute did not censor speech in the traditional sense--it only required newspapers to grant access to the messages of others--we found that it imposed an impermissible content-based burden on

1    newspaper speech." *Turner Broad. Sys.* 512 U.S. at 653-654.  Accordingly, the Court found that

2    *Tornillo* is inapplicable to cases where the alleged infringement on First Amendment rights is an

3    incidental result of content neutral laws.  *Id.* at 655.

4         Furthermore, Facebook's wrongful acts were not limited to removing Plaintiff's posts.

5    Facebook engaged in additional acts not traditionally part of editorial functions such as

6    restricting, suspending, and limiting other users' access to Facebook's services based on their

7    association with Plaintiff, the ECL page, or the Friends of Ebeid group. *See* Complaint ¶¶ 18-39.

8         Accordingly, Facebook cannot claim First Amendment protection for violating content

9    neutral laws of general applicability as alleged in the Complaint.

10                        2.  By Regulating Free Speech in a Public Forum, Facebook is Engaging in
                               a Traditional Public Function and Thus Within the Purview of First
11                             Amendment Protection

12        The Supreme Court has long recognized that "the First Amendment reflects a profound

13   national commitment to the principle that debate on public issues should be uninhibited, robust,

14   and wide-open, … and have consistently commented on the central importance of protecting

15   speech on public issues." *Boos v. Barry*, 485 U.S. 312, 318 (1988) (internal citations and

16   quotation marks omitted).  In light of today's fast paced technological advances and societal

17   trends towards privatization, the issue of regulating speech activities has become even more

18   potent.  *ACLU of Nev. v. City of Las Vegas,* 333 F.3d 1092, 1097 (9th Cir. 2003).  As put by

19   Justice Kennedy in his concurring opinion in *Kokinda*, "[a]s society becomes more insular in

20   character, it becomes essential to protect public places where traditional modes of speech and

21   forms of expression can take place. *United States v. Kokinda,* 497 U.S. 720, 737 (1990).

22        From time immemorial, public sidewalks, streets and parks were the quintessential

23   traditional public forums for speech related activities.  *See ACLU of Nev.* 333 F.3d at 1099.

24   However, in recent years, these public forums have given way to social media websites and other

25   online platforms in which the masses engage in speech activities.  Facebook being arguably the

26   world's largest social networking platform, provides its billions of daily users with a public

27   forum in which they can engage in discussions, debates, and other speech related activities.

28

Notably, Facebook does not challenge its status as a public forum.  Facebook's sole contention on this issue is that it is not a state actor and thus the First Amendment's prohibition against restricting speech does not apply to it.

It is true that Facebook is a private entity.  However, this fact alone those not place Facebook outside the grasp of the First Amendment.  "What is fairly attributable [as State action] is a matter of normative judgment, and the criteria lack rigid simplicity. . . . [No] one fact can function as a necessary condition across the board . . . nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason."  *Lee v. Katz,* 276 F.3d 550, 554 (9th Cir. 2002). Where a private entity performs a function that is traditionally and exclusively governmental, the private entity is considered a state actor.  *Id.* at 555.  It is important to note that for there to be state action, not all of the private entity's actions need to be considered traditional public functions, only those that are at issue.  *See George v. Pacific-CSC Work Furlough,* 91 F.3d 1227, 1230 (9th Cir. 1996) ("an entity may be a state actor for some purposes but not for others."). Accordingly, in reviewing the present matter, it is sufficient that Facebook's regulation of speech on its public forum would be considered a traditional public function.

In this regard, Facebook's various actions described in the Complaint were designed to regulate and limit the Plaintiff's free speech on Facebooks public platform.  However, the function at issue is not the creation and maintenance of an online platform.  It is Facebook's *act of regulating free speech* within a public forum, which is quintessentially an exclusive and traditional public function. *Lee* 276 F.3d at 557.

Accordingly, Facebook's regulation of speech on a public forum satisfies the traditional public function test, making Facebook a state actor for First Amendment purposes.

### C. This Court Should Consider Facebook as a Place of Public Accommodation Under 42 U.S.C. § 2000a

Pursuant to Title II of the Civil Rights Act of 1964 ("Title II") "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without

1   discrimination or segregation on the ground of race, color, religion, or national origin."  42

2   U.S.C. § 2000a (a).  Establishments that are covered by Title II are broadly identified as

3   "Establishments *affecting interstate commerce* or supported in their activities by State action as

4   places of public accommodation; lodgings; facilities principally engaged in selling food for

5   consumption on the premises; gasoline stations; *places of exhibition or entertainment; other*

6   *covered establishments.*"  U.S.C. § 2000a (b) (emphasis added). The statute continues by stating:

> Each of the following establishments which serves the public is a place of public
> accommodation within the meaning of this title [42 USCS §§ 2000a-2000a-6] if its
> operations affect commerce, or if discrimination or segregation by it is supported by State
> action:
>     **(3)**  any motion picture house, theater, concert hall, sports arena, stadium or *other*
>     *place of exhibition or entertainment*

*Id.* (emphasis added).

Nothing in the language of the statute precludes the Court from recognizing Facebook as

an "other place of exhibition or entertainment" for Title II purposes.  Facebook, argues that it

should not be considered a place of public accommodation because it lacks sufficient connection

to a physical facility.  Although it is correct that Facebook's public forum exists on the internet,

this fact alone should not automatically exclude it from adherence to Title II prohibitions.

As a preliminary matter, Facebook has a physical office within this Court's jurisdiction,

in which Facebook's public forum is operated and regulated.  Complaint ¶ 9.  The discriminatory

acts complained of by the Plaintiff were most likely carried out or put into action by individuals

at Facebook's physical offices tasked with monitoring Facebook's online platform.  Accordingly,

although Facebook's public forum itself exists on the web, operation and regulation of this

public forum occurs at Facebook's physical offices, establishing a sufficient connection between

the public forum and a physical location.

Furthermore, although a website such as Facebook's public forum is not a physical

location, it is an identifiable "place" for all intents and purposes.  Facebook's public forum's

infrastructure is housed and maintained on physical servers within physical data centers across

the world.  On the internet, online activity on Facebook's website has an identifiable address,

also known as Internet Protocol (IP) address, which can even be used to pinpoint the user's physical location.  As technology advances, the line between physical locations and locations on the web are becoming more and more blurred.

In answering whether business entities which offer services through the internet fall within the definition of public accommodation under Title II, the Court should take note of the jurisprudence on public accommodation under Title III of the Americans with Disabilities Act ("ADA").  *See, PGA Tour, Inc. v. Martin,* 532 U.S. 661, 681 (2001) ("Our conclusion is consistent with case law in the analogous context of Title II of the Civil Rights Act of 1964…"); *Carparts Distrib. Ctr. v. Auto. Wholesaler's Ass'n,* 37 F.3d 12, 16 (1st Cir. 1994).  Almost two decades have passed since the Ninth Circuit declined to extend the definition of public accommodation under the ADA to business not offering their services through a physical location.  *Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104, 1114 (9th Cir. 2000). Although the Ninth Circuit's decided *Weyer* almost twenty years ago, and did not discuss multibillion-dollar online businesses such as Facebook, its holding has since been extended to online businesses, albeit slightly expanded. *See, Nat'l Fed'n of the Blind v. Target Corp.,* 452 F.Supp.2d 946, 956 (N.D.Cal. 2006) (holding that to the extent discrimination on a website impedes equal enjoyment of goods and services at the business's physical stores, the website is considered a place of public accommodation under the ADA).

This arbitrary distinction between businesses that offer their services solely through online websites, and businesses that offer services through a website and a physical location has been rejected by other Circuits.  For example, the First Circuit in determining whether a physical location is required to fall within the protection of the ADA has stated that "[t]he plain meaning of the terms do not require 'public accommodations' to have physical structures for persons to enter. Even if the meaning of 'public accommodation' is not plain, it is, at worst, ambiguous. This ambiguity, considered together with agency regulations and public policy concerns, persuades us that the phrase is *not limited to actual physical structures*." *Carparts Distrib. Ctr.* 37 F.3d at 19 (emphasis added).  Similarly, the Seventh Circuit in analyzing places of public

1   accommodation under the ADA found that "[t]he core meaning of this provision, plainly enough,

2   is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater,

3   *Web site*, or other facility (whether in physical space or in *electronic space*) that is open to the

4   public cannot exclude disabled persons from entering the facility and, once in, from using the

5   facility in the same way that the nondisabled do." *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557,

6   559 (7th Cir. 1999) (emphasis added, internal citations omitted).  The fact that web-based

7   services are not enumerated under the ADA is irrelevant, because such web-based services did

8   not exist when the ADA was enacted.  *Nat'l Ass'n of the Deaf v. Netflix, Inc.,* 869 F.Supp.2d 196,

9   200 (D.Mass. 2012). It is sufficient if such web-based businesses fall within one of the categories

10   covered by the ADA.  *Id*. at 201.

11          The above cases are highly persuasive in the present matter because similar to the ADA,

12   Title II does not by its language preclude holding web-based services liable for discrimination.

13   When Title II was enacted, the legislature could not have contemplated the concept of activities

14   and services being offered in an intangible place such as the internet.  Similarly, up until the past

15   decade or so, legislatures and courts could not foresee just how many people would engage in

16   and be impacted by online services such as Facebook.  However, under the court's reasoning in

17   *Netflix, Inc.*, it is irrelevant that web-based services such as Facebook are not enumerated under

18   Title II, because they did not exist when Title II was enacted.  Nor is any imagination necessary

19   to hold that Facebook within the category of other place of exhibition or entertainment.

20          Finally, holding Facebook accountable for discriminatory actions pursuant to Title II is

21   consistent with Congress' intent in enacting Title II to end discrimination in public

22   accommodations affecting interstate commerce.  Tara Thompson, *COMMENT: Locating*

23   *Discrimination: Interactive Web Sites as Public Accommodations under Title II of the Civil*

24   *Rights Act*, 2002 U Chi Legal F 409, 432 (citing S Rep No 872, 88th Cong, 2d Sess 11 (1964),

25   reprinted in 1964 USCCAN 2365.). As was explained to the Senate Committee on the Judiciary

26          Public establishments presently discriminating . . . are enjoying the benefits of access to a
           participation in commerce. The business of such establishments is fostered and made

27          more profitable because of the advantages afforded them by utilizing these various
           channels of commerce. However, when the discriminatory practices employed by such

28

establishments lead to demonstrations or boycotts in addition to the humiliation of those subject to discrimination, the economy of our Nation suffers.
*Id*. at 433.

Facebook is enjoying the benefits of access to a participation in interstate commerce, yet it wishes to be held immune from liability arising from prohibited discrimination under Title II, because it offers services in a medium that did not exist when Title II was enacted.  As the First Circuit held, distinguishing between services being offered at a physical location rather than exclusively in other mediums such as telephone or by mail "would run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public."  *Carparts Distrib. Ctr.* 37 F.3d at 20.  Similarly, allowing Facebook and other web-based services to escape liability for discriminatory practices would run afoul of, and frustrate Congress' intent in enacting Title II.  Furthermore, the Court's reasoning in *Carparts* under the ADA is just as wise when applied to Title II: "It would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. Congress could not have intended such an absurd result."  *Id*. at 19.  It would be equally absurd for example to prohibit a physical movie theater from discriminating against Arab Americans, but allow an online movie service, offering the same movies, to freely exclude Arab Americans from using its services.

Based on the foregoing, Facebook falls within the meaning of other place of exhibition or entertainment as a place of public accommodation, and thus liable under Title II.

### D. Plaintiff has Plead Sufficient Facts to Support Relief Under California's Unruh Civil Rights Act

Pursuant to the California Unruh Civil Rights Act (hereinafter "Unruh Act"):

All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services *in all business establishments of every kind whatsoever*. Cal. Civ. Code, § 51(b) (emphasis added).

1    According to the California Supreme Court: "The Legislature used the words 'all' and 'of

2  every kind whatsoever' in referring to business establishments covered by the Unruh Act, and the

3  inclusion of these words without any exception and without specification of particular kinds of

4  enterprises, leaves no doubt that the term 'business establishments' was used in the broadest sense

5  reasonably possible." *O'Connor v. Village Green Owners Assn.*, 33 Cal.3d 790, 795 (1983)

6  (internal citations omitted). Under the Unruh Act "[t]he word 'establishment,' as broadly defined,

7  includes not only a fixed location, such as the 'place where one is permanently fixed for

8  residence or business,' but also a permanent 'commercial force or organization' or 'a permanent

9  settled position (as in life or business)." *Id.* (holding that a home owner's association is a

10  business establishment within meaning of the Unruh Act).

11    Under this broad definition, there is no question, nor does Facebook challenge, that

12  Facebook is a business establishment within the meaning of the Unruh Act.  Accordingly,

13  Facebook must adhere to the prohibition against discrimination set forth in the Unruh Act.

14    1.  <u>The Plaintiff's State of Residence Is Immaterial Because the Alleged
    Discriminatory Actions Occurred in California</u>

15

16    Facebook argues that since the Plaintiff is a resident of Arizona, he cannot avail himself

17  of the protections of the Unruh Act because the Act does not apply outside of California.  In so

18  arguing, Facebook confuses the Plaintiff's residence with the applicability of the Unruh Act

19  outside of California. It is true that as a general matter, in enacting California statutes "the

20  Legislature did not intend a statute to be operative, with respect to occurrences outside the state,

21  unless such intention is clearly expressed or reasonably to be inferred from the language of the

22  act or from its purpose, subject matter or history." *Sullivan v. Oracle Corp.*, 51 Cal.4th 1191,

23  1207 (2011) (internal citations and quotation marks omitted). However, this does not mean that a

24  non-California resident is precluded from bringing a claim under the Unruh Act for

25  discrimination occurring in California.  In this regard, Facebook's reliance on *Sousanis v.

26  Northwest Airlines, Inc.*, 2000 U.S.Dist.LEXIS 23607 (N.D.Cal. Mar. 3), is misplaced.  The

27  *Sousanis* court found that a California resident cannot bring an action under the Unruh Act where

28

1  the events giving rise to the action took place in the state of Michigan.  *Id.* at *15.  Conversely,

2  Facebook is arguing that a non-California resident cannot bring a claim for violations of the

3  Unruh Act occurring within California, which is the inverse of the Court's holding in *Sousanis*.

4        California statutes may apply to non-California residents depending on where the

5  defendant does business, whether the defendant's principal offices are located in California, and

6  the location from which the decisions regarding the challenged actions were made.  *See, Warner*

7  *v. Tinder Inc.,* 105 F. Supp. 3d 1083, 1096 (C.D.Cal. 2015).  Facebook's headquarter is located

8  in California, from which Facebook operates and regulates its online public forum and

9  advertising platform.  Complaint ¶ 9.  It stands to reason that decisions regarding the challenged

10  discriminatory actions, and carrying out such actions also occurred at Facebook's headquarters.

11  Finally, Facebook conducts business on a global scale through the internet, including within the

12  jurisdiction of the state of California.  Complaint ¶ 9.  Thus, the Unruh Act is applicable to

13  Facebook's discriminatory actions against the Plaintiff, regardless of where the Plaintiff's

14  residence.

15              2.  Plaintiff Has Sufficiently Alleged Intentional Discrimination by Facebook

16        The purpose of the Unruh Act is to "create and preserve a nondiscriminatory environment

17  in California business establishments by banishing or eradicating arbitrary, invidious

18  discrimination by such establishments." *Flowers v. Prasad,* 238 Cal.App.4th 930, 937 (2015)

19  (internal quotation marks omitted).  "The Act is to be given a liberal, and not a strict,

20  construction with a view to effect its object and to promote justice." *Winchell v. English,* 62

21  Cal.App.3d 125, 128 (1976).

22        To establish a claim under the Unruh Act, the plaintiff must allege intentional

23  discrimination in violation of the Act, as opposed to practices and policies that apply equally to

24  all persons.  *Greater L.A. Agency on Deafness, Inc. v. CNN, Inc.,* 742 F.3d 414, 425 (9th Cir.

25  2014).  The California Supreme Court elaborated on the need to allege intentional

26  discrimination, by stating that the Unruh Act contemplates "willful, affirmative misconduct on

27  the part of those who violate the Act and that a plaintiff must therefore allege, and show, more

28

than the disparate impact of a facially neutral policy." *Id*.

The Plaintiff's complaint alleges discriminatory actions directed at him, not a disparate impact of applying a policy that is equally applied to all users.  The Complaint alleges that Plaintiff is of Egyptian origin and that the majority of the Plaintiff's posts were in Arabic. Complaint ¶¶ 10, 14.  Plaintiff also alleges that Facebook began discriminating against him when he began his campaign for the removal of the then British Ambassador, who the Plaintiff believed was threatening the legitimacy of the new Egyptian government and Judiciary subsequent to the Muslim Brotherhood's rule in Egypt.  Complaint ¶ 16.  Furthermore, Plaintiff has alleged sufficient facts to establish Facebook arbitrarily discriminated against him solely to interfere with his ability to campaign for the recall of the them British Ambassador.  Complaint ¶ 34.  Plaintiff's allegations do not arise from Facebook's removal of Plaintiff's posts from the Facebook's public forum as Facebook would like the Court to believe.  The removal of posts was but one form of discriminatory action against the Plaintiff, in addition to suspending his account and access to the ECL public page, suspending or threatening to suspend other users' ability to interact and contribute to the Plaintiff's campaign, and wrongfully notifying him that his posts were being boosted. *See generally* Complaint ¶¶ 17-38.  The arbitrariness of Facebook's discriminatory actions is established by the fact that at no point did Facebook provide any explanations for such actions, and when the Plaintiff contacted Facebook to inquire as to why his posts were being removed, Facebook responded by stating "[w]e took another look and found it doesn't go against our Community Standards, so we've restored your post," only to remove another similar post as "spam" mere days later.  Complaint ¶ 33.  Finally, Plaintiff has alleged that he invested a substantial amount of time and funds in promoting the ECL Public page, and was damaged by Facebook's relentless restrictions on his ability to promote and grow his page. Complaint ¶ 39.  Accordingly, the Plaintiff has alleged sufficient facts to support his cause of action under the Unruh Act.

### E.  Plaintiff has Sufficiently Plead the Breach of Contract Cause of Action

A complaint alleging breach of contract is sufficiently plead if it alleges: (1) the existence

1  of a contract; (2) plaintiff's performance or excused non-performance; (3) defendant's breach;

2  and (4) resulting harm to plaintiff. *Cmty. Hosp. of the Monterey Peninsula v. Aetna Life Ins.*

3  *Co.*, 119 F. Supp. 3d 1042, 1048 (N.D.Cal. 2015)

4        In order to create a Facebook account, the Plaintiff and Facebook entered into a contract

5  through Facebook's Terms of Service ("TOS") with the within incorporated Advertising Policy

6  and Self-Serve Ad Terms ("SSAT").  Complaint ¶ 65; *See* Motion to Dismiss 15:2-15.

7  Plaintiff's general obligation under the TOS and SSAT is that he would use Facebook's services

8  in compliance with the rules and prohibitions set out in the TOS and SSAT.  *See* Motion to

9  Dismiss, Yu Decl. Ex. A and E.  Plaintiff performed his obligations under the contract by

10  complying with the terms of the TOS and SSAT.  *See* Complaint ¶ 66.  Under the section titled

11  "Our Services" the TOS states:

12        Empower you to express yourself and communicate about what matters to you: There are
         many ways to express yourself on Facebook and to communicate with friends, family,
13        and others about what matters to you - for example, sharing status updates, photos,
         videos, and stories across the Facebook Products you use, sending messages to a friend or
14        several people, creating events or groups, or adding content to your profile."

15        Motion to Dismiss, Yu Decl. Ex. A.

16        However, Facebook's constant restrictions and limitations were in breach of Plaintiff's

17  right to express himself and communicate about what matters to him, as provided for in the TOS.

18  Similarly, the SSAT states that "[w]hen serving your ad, we use best efforts to deliver the ads to

19  the audience you specify or to achieve the outcome you select, though we cannot guarantee in

20  every instance that your ad will reach its intended target or achieve the outcome you select."

21  Motion to Dismiss, Yu Decl. Ex. E.  However, Plaintiff alleges that despite approving the adds,

22  Facebook did not use best efforts to deliver Plaintiff's ads.  Complaint ¶¶ 37, 67.  Finally,

23  Plaintiff alleges that he has spent an average of 20 hours per week and a substantial sum of funds

24  in promoting and growing the ECL page and the campaign, and has suffered damages in an

25  amount to be proven at trial, caused by Facebooks breach of the TOS and SSAT. Complaint ¶¶

26  39, 68.  Accordingly, the Plaintiff has sufficiently plead a cause of action for breach of contract.

27

28

1

2

### F. Plaintiff has sufficiently plead the Breach of Covenant of Good Faith and Fair Dealing Cause of Action

3

4

"Every contract imposes upon each party a duty of good faith and fair dealing in its

5

performance and its enforcement [requiring] that neither party will do anything which will injure

the right of the other to receive the benefits of the agreement." *Best Buy Stores, L.P. v. Manteca*

6

*Lifestyle Ctr., LLC,* 859 F.Supp.2d 1138, 1151 (E.D.Cal. 2012) (internal citations and quotation

7

marks omitted). Furthermore, the importance of this covenant "finds particular application in

8

situations where one party is invested with a discretionary power affecting the rights of another.

9

Such power must be exercised in good faith." *Id.* at 1152. Plaintiff's expected benefit from his

10

agreement with Facebook was that he would be able to promote the ECL page and his campaign

11

without any restrictions, so long as he complied with the prohibitions set out in the TOS and

12

SSAT. Furthermore, the TOS, Advertising Policy, and SSAT specifically grant Facebook the

discretionary power to affect the Plaintiff's expected rights and benefits under the agreements, by

13

giving Facebook to ability to remove or disapprove any post or add at Facebook's sole

14

discretion. *See* Motion to Dismiss, Yu Decl. Ex. A, C, and E. Plaintiff alleges that Facebook's

15

discriminatory actions have interfered with his ability to grow and promote the ECL page and his

16

campaign, and thus has failed to exercise its discretion in good faith. *See* Complaint ¶ 17.

17

Furthermore, although Plaintiff's breach of contract cause of action is well plead, Facebook's

18

argument that the breach of implied covenant of good faith and fair dealing cause of action must

19

fail if the breach of contract claim fails, is incorrect. "The implied covenant of good faith and

20

fair dealing is implied in *every* contract, and one does not need allege or prove a breach of

21

contract claim in order to bring a breach of implied covenant claim. All that is required for an

22

implied covenant claim is the *existence* of a contractual relationship between the parties. *Way v.*

23

*JP Morgan Chase Bank, N.A.*, 2018 U.S.Dist.LEXIS 77622, at *9 (E.D.Cal. May 7, 2018).

24

Facebook has conceded that the TOS, Advertising Policy, and SSAT "[are] general-purpose

25

contract[s] that govern Facebook's relationship with all of its users." Motion to Dismiss 15:7-12.

26

Thus, the Plaintiff has sufficiently plead a cause of action for breach of implied covenant of good

27

28

---

1   faith and fair dealing.

### G.  Plaintiff has Sufficiently Plead the Fraud/Intentional Misrepresentation Cause of Action

To state a cause of action for fraud based on an intentional misrepresentation, the Complaint must allege: (1) a misrepresentation; (2) knowledge of falsity; (3) intent to defraud or to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Marble Bridge Funding Group, Inc. v. Euler Hermes Am. Credit Indem. Co.*, 225 F. Supp. 3d 1034, 1039 (N.D.Cal. 2016). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The particularity requirement of Rule 9(b) must however be applied consistent with Rule 8's requirement of a short and plain statement of the claim. *Biggins v. Wells Fargo & Co.*, 266 F.R.D. 399, 409 (N.D.Cal. 2009). Accordingly, "the particularity requirement is satisfied if the complaint identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations.  *Id.*

Plaintiff is not alleging that Facebook wrongfully denied his ads for boosting, but that Facebook approved the ads and notified him that they were being boosted, where in fact they were not.  Facebook represented to the Plaintiff that the posts he submitted for boosting on May 20, 2018, and May 30, 2018, were approved and boosted.  Complaint ¶¶ 36-38.  As to Facebook's scienter "false representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered."  *Engalla v. Permanente Medical Group, Inc.*, 15 Cal.4th 951, 974 (1997). Plaintiff alleges that the posts Facebook represented as being boosted were in fact not boosted. Complaint ¶¶ 36-38.  Although the Plaintiff does not presently know if Facebook knew the posts were not being boosted, in operating its advertising platform, Facebook should know what ads have been boosted when making a representation to the user.  Complaint ¶ 59.  Thus, the representation made to the Plaintiff that the posts were boosted was made with a reckless disregard of the truth.  Facebook made these misrepresentations in order to interfere with the

Plaintiff's campaign.  *Id.*  Any further evaluation to determine whether these allegations are sufficient to establish fraudulent intent by Facebook is an issue to be determined by the trier of fact.  *Diamond Woodworks, Inc. v. Argonaut Ins. Co.,* 109 Cal.App.4th 1020, 1046 (2003).

Given his prior experience with Facebook boosting and Facebook's status as global multibillion-dollar advertising platform, the Plaintiff reasonably relied on Facebook's representations.  Complaint ¶ 60.  Finally, although the Plaintiff was not charged for the specific ads not boosted, Facebook's misrepresentation interfered with Plaintiff's ability to promote and grow the ECL page and the campaign in amount to be proven at trial.  *Id.* at ¶¶ 39, 60.

Accordingly, the Plaintiff has sufficiently plead a cause of action for fraud/intentional misrepresentation.  The alleged facts are sufficient to withstand Facebook's motion to dismiss for failure to state a claim under Rule 12(b)(6), because "[i]t is not the ordinary function of a [motion to dismiss for failure to state a claim] to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct." *Beckwith v. Dahl,* 205 Cal.App.4th 1039, 1061 (2012).

### H. Plaintiff has Sufficiently Plead the Unlawful Business Practices Cause of Action

The California Unfair Competition Law (UCL) does not proscribe specific activities, but broadly prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code, § 17200.  Because section 17200 of the UCL is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent; in other words, a practice is prohibited as "unfair" or "deceptive" even if not "unlawful," and vice versa.  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 180 (1999).  By proscribing "any unlawful" business practice, section 17200 of the UCL borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.  *Id.*

As discussed above, the Complaint has sufficiently plead causes of action for violation of

United States Civil Rights Act, the California Unruh Civil Rights Act, and fraud/intentional misrepresentation.  Accordingly, Plaintiff's UCL cause of action is also well plead.

### I.   Should the Court Find the Complaint Insufficient, Plaintiff Requests That the Court Grant Him Leave to Amend

It is well established that when a district court grants a dismissal for failure to state a claim under Rule 12(b)(6), "[the] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir. 2000).

In the present matter, the Plaintiff believes that he has sufficiently plead all causes of action in the Complaint.  However, Plaintiff can simply cure any purported defects by amending the Complaint to include additional facts.  Accordingly, if this Court believes that the Complaint is insufficient in any respect, Plaintiff respectfully requests leave to amend the Complaint.

### J.   Facebook's Request for Dismissal and Attorney's Fees Under the California Anti-SLAPP Statute Must Fail

Facebook argues that Plaintiff's Unruh Act and UCL causes of action should be struck under the California Anti-SLAPP Statute because it is an attempt to chill Facebook's right to free speech under the First Amendment.  As established in section C. 1. above, the First Amendment does not protect Facebook's discriminatory actions in violation of the Unruh Act. Nevertheless, Facebook's Anti-SLAPP motion fails as a matter of law.

In ruling on an anti-SLAPP motion, the trial court must engage in a two-step process that involves shifting burdens. *Castleman v. Sagaser,* 216 Cal.App.4th 481, 490 (2013).  First, the moving party has the initial burden of making a threshold showing that the challenged cause of action "arises from" protected activity.  Cal. Civ. Proc. Code § 425.16, subd. (b)(1).  In order to meet this burden, the moving party must show that the act underlying the challenged cause of action fits into one of the categories described in subdivisions (e)(1) to (e)(4) of the anti-SLAPP statute.  *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1043.  If the moving party fails to show that the lawsuit "arises from" protected activity, the court does not have to address the merits of the case under the second step of the anti-SLAPP statutory analysis.

1  *Castleman,* 216 Cal.App.4th at 490 (citation omitted).  If, however, the moving party has made

2  the threshold showing, the burden in step two shifts to the opposing party.  Cal. Civ. Proc. Code

3  § 425.16, subd. (b)(1).  Under step two of the statutory analysis, the opposing party must

4  demonstrate a probability of prevailing on the claim.  *Id.*

5                      1.  <u>Plaintiff's Causes of Action Under the Unruh Act and UCL Do Not<br>Arise from a Protected Activity</u>

6

7        The California Supreme Court has emphasized that, "the mere fact that an action was

8  filed after protected activity took place does not mean it arose from that activity."  *City of Cotati*

9  *v. Cashman,* 29 Cal.4th 69, 76-77 (2002). "The defendant's act underlying the plaintiff's cause

10  of action must *itself* have been an act in furtherance of the right of petition or free speech *Id.* at

11  78 (emphasis in original).  The gravaman of the Plaintiff's Complaint is discrimination, not

12  Facebook's removal of the Plaintiff's posts or denying his posts for boosting.  "[A] claim may be

13  struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just

14  evidence of liability or a step leading to some different act for which liability is asserted." *Park*

15  *v. Board of Trustees of California State University,* 2 Cal.5th 1057, 1060 (2017).

16        To interpret the anti-SLAPP statute otherwise would be in contradiction with the

17  legislatures intent because it would provide Facebook and other similarly situated business

18  establishments a safe harbor for discriminatory and retaliatory conduct, so long as they carry out

19  the wrongful acts under the guise of some protected activity.  *See Martin v. Inland Empire*

20  *Utilities Agency,* 198 Cal.App.4th 611, 625 (2011).

21                      2.  <u>Plaintiff has Sufficiently Demonstrated a probability of Prevailing On<br>the Asserted Claims</u>

22        To satisfy step two of the anti-SLAPP analysis, Plaintiff must demonstrate that his

23  Complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to

24  sustain a favorable judgment, assuming his evidence is credited. *Oasis West Realty, LLC V.*

25  *Goldman,* 51 Cal.4th. 811, 820 (2011) (internal quotation marks and citations omitted).  In

26  regards to Anti-SLAPP motions brought in Federal Courts, the Ninth Circuit has cautioned that

27  "[p]rocedural state laws are not used in federal court if to do so would result in a direct collision

28

1  with a Federal Rule of Civil Procedure." *Verizon Del., Inc. v. Covad Communs. Co.,* 377 F.3d

2  1081, 1091 (9th Cir. 2004). Federal Courts should "refuse[] to apply certain discovery-limiting

3  provisions of the anti-SLAPP statute because they would conflict with Fed. R. Civ. P. 56." *Id.*

4  Should the Court be inclined to grant Facebook's Anti-SLAPP motion to strike and request for

5  attorney's fees, Rule 15(a) requires that the Court grant the Plaintiff leave to amend before

6  granting the Anti-SLAPP motion.  *Id.*

7         In the alternative, Plaintiff respectfully requests that the Court reserve Facebook's Anti-

8  SLAPP Motion for a later date, allowing the Plaintiff to submit additional briefing and evidence

9  to the Court on this issue.  This is because in order for Plaintiff to provide sufficient evidence for

10  a prima facia showing of facts to sustain a favorable judgment on his UCL cause of action, he

11  must also provide sufficient evidence for a prima facia showing of facts to sustain a favorable

12  judgment all other causes of action in the Complaint, which is not feasible given the complexity

13  of the issues already discussed in the present to Motion to Dismiss.

14  **IV.    CONCLUSION**

15         For the foregoing reasons, the Plaintiff respectfully requests that the Court deny

16  Facebook's Motion to Dismiss and Anti-SLAPP motion including the request for attorney's fees

17  in their entirety.

18

19  DATED:  March 21, 2019                Respectfully submitted,

20                                          KHOURI LAW FIRM, APC

21

22                                  By:    */s/ Michael J. Khouri*_____
                                           MICHAEL J. KHOURI
23                                         Attorneys for Plaintiff,
                                           SADEK RAOUF EBEID, M.D.
24

25

26

27

28
―――――――――――――――――――――――――――――――――――――――――――――――
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT, SPECIAL MOTION
TO STRIKE AND FOR ATTORNEY'S FEES AND COSTS
Case No. 4:18-cv-07030-PJH
Page 25 of 25