KEKER, VAN NEST & PETERS LLP
PAVEN MALHOTRA - # 258429
pmalhotra@keker.com
VICTOR H. YU (appearance Pro Hac Vice) - #5502372
vyu@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:      415 397 7188

Attorneys for Defendant
FACEBOOK, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SADEK RAOUF EBEID, M.D., <br><br> Plaintiff, <br><br> v. <br><br> FACEBOOK, INC., <br><br> Defendant. | Case No. 4:18-cv-07030-PJH <br><br> **REPLY BRIEF IN SUPPORT OF FACEBOOK'S MOTION TO DISMISS AND ANTI-SLAPP MOTION TO STRIKE** <br><br> Date:     May 1, 2019 <br> Time:    9:00 am <br> Judge:   Hon. Phyllis J. Hamilton <br> Dept.:    Courtroom 3 <br><br> Date Filed: November 19, 2018 <br><br> Trial Date: Not Set |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................1

II. PLAINTIFF'S CONTENT-RESTRICTION CLAIMS ARE BARRED BY FEDERAL LAW ......................................................................................................1

    A. CDA § 230(c)(1) Immunizes Facebook from Plaintiff's Content-Restriction Claims .............................................................................................................1

        1. CDA § 230 immunity applies when a party's own content is at issue .................................................................................................2

        2. CDA § 230 protects internet platforms that remove content ......................2

    B. Instead of Being Regulated by the First Amendment (Count II), Facebook is Protected by it ..............................................................................................3

        1. Facebook is not a state actor nor does it perform a "public function" .........3

        2. As a private actor, Facebook is protected by the First Amendment ............4

    C. All of Plaintiff's Content-Restriction Claims Are Individually Deficient ...............4

        1. Facebook's online platform is not regulated by Title II of the Civil Rights Act (Count I) ...............................................................................5

        2. Plaintiff fails to allege any in-state discrimination to state a viable Unruh Act claim (Count III) ..................................................................6

            a. Plaintiff seeks to use the Unruh Act extraterritorially ....................6

            b. Alternatively, Plaintiff's Unruh Act claim fails because he alleges no intentional discrimination ..............................................7

III. PLAINTIFF'S "BOOSTING" CLAIMS SHOULD BE DISMISSED WITH PREJUDICE ...........................................................................................................8

    A. Facebook Did Not Breach Any Contractual Term (Count V) ...............................8

    B. Facebook Cannot Breach Any Implied Covenant (Count VI) .............................10

    C. Plaintiff Has Failed to Properly Plead Fraud (Count IV) ....................................11

    D. Plaintiff's Derivate UCL Claim Must Also Be Dismissed (Count VII) ................12

IV. THE COMPLAINT CANNOT STATE A CAUSE OF ACTION ON BEHALF OF THIRD PARTIES .................................................................................................12

V. PLAINTIFF'S UNRUH ACT AND PART OF HIS UCL CLAIM MUST BE STRIKEN UNDER CALIFORNIA'S ANTI-SLAPP LAW ............................................12

VI. CONCLUSION .....................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Barnes v. Yahoo!*,
  570 F.3d 1096 (9th Cir. 2009) ............................................................................................. 2, 3

*Boarman v. Cty. of Sacramento*,
  2013 WL 3894167 (E.D. Cal. July 26, 2013) .......................................................................... 8

*Bowden v. Redwood Inst. for Designed Educ., Inc.*,
  1999 WL 138889 (N.D. Cal. Mar. 9, 1999) ............................................................................ 7

*Brunette v. Humane Soc'y of Ventura Cty*,
  294 F.3d 1205 (9th Cir. 2002) ................................................................................................ 3

*Carparts Distrib. Center, Inc. v. Automotive Wholesale's Ass'n of New England, Inc.*,
  37 F.3d 12 (1st Cir. 1994) .................................................................................................. 5, 6

*Clegg v. Cult Awareness Network*,
  18 F.3d 752 (9th Cir. 1994) ................................................................................................ 5, 6

*Coal. of Clergy, Lawyers, & Professors v. Bush*,
  310 F.3d 1153 (9th Cir. 2002) .............................................................................................. 12

*Doe v. Mut. of Omaha Ins. Co.*,
  179 F.3d 557 (7th Cir. 1999) .................................................................................................. 5

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) ............................................................................................ 2, 3

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*,
  742 F.3d 414 (9th Cir. 2014) ............................................................................................ 7, 13

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ................................................................................................................ 4

*J2 Cloud Servs., Inc. v. Fax87*,
  2016 WL 6833904 (C.D. Cal. Nov. 18, 2016) ...................................................................... 11

*Jones v. AIG Risk Mgmt., Inc.*,
  726 F. Supp. 2d 1049 (N.D. Cal. 2010) ................................................................................ 11

*Lancaster v. Alphabet, Inc.*,
  2016 WL 3648608 (N.D. Cal. July 8, 2016) ...................................................................... 2, 3

*McShannock v. JP Morgan Chase Bank N.A.*,
  354 F. Supp. 3d 1063 (N.D. Cal. 2018) .................................................................................. 9

# TABLE OF AUTHORITIES

**Page(s)**

*Nat'l Ass'n of the Deaf v. Netflix, Inc.*,
   869 F. Supp. 2d 196 (D. Mass. 2012) ................................................................................. 5

*Noah v. AOL Time Warner Inc.*,
   261 F. Supp. 2d 532 (E.D. Va. 2003) .................................................................................. 6

*Perfect 10, Inc. v. CCBill LLC*,
   481 F.3d 751 (9th Cir. 2007) ............................................................................................... 1

*Prager Univ. v. Google LLC*,
   2018 WL 1471939 (N.D. Cal. Mar. 26, 2018) .................................................................... 4

*Shahangian v. Bank of Am. Nat'l Ass'n*,
   2015 WL 12696038 (C.D. Cal. Dec. 1, 2015) .................................................................. 12

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
   697 F. App'x 526 (9th Cir. 2017) ....................................................................................... 3

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
   144 F. Supp. 3d 1088 (N.D. Cal. 2015) ........................................................................ 2, 3

*Smith v. Pride Mobility Prods. Corp.*,
   2016 WL 6393549 (N.D. Cal. Oct. 28, 2016) .................................................................... 8

*Tat Tohumculuk, A.S. v. H.J. Heinz Co.*,
   2013 WL 6070483 (E.D. Cal. Nov. 14, 2013) .................................................................... 7

*Turner Broadcasting Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ............................................................................................................. 4

*United States v. Easterday*,
   564 F.3d 1004 (9th Cir. 2009) ............................................................................................. 5

*Warner v. Tinder, Inc.*,
   105 F. Supp. 3d 1083 (C.D. Cal. 2015) .......................................................................... 6, 7

*Way v. JP Morgan Chase Bank, N.A.*,
   2018 WL 2117630 (E.D. Cal. May 8, 2018) .................................................................... 10

*Weyer v. Twentieth Century Fox Film Corp.*,
   198 F.3d 1104 (9th Cir. 2000) ............................................................................................. 5

*Young v. Facebook, Inc.*,
   790 F. Supp. 2d 1110 (N.D. Cal. 2011) .............................................................................. 5

*Zhang v. Baidu.com, Inc.*,
   10 F. Supp. 3d 433 (S.D.N.Y. 2014) ................................................................................... 4

# TABLE OF AUTHORITIES

Page(s)

**State Cases**

*Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
    2 Cal. 4th 342 (1992) ...................................................................................................... 10

*Martin v. Inland Empire Utils. Agency*,
    198 Cal. App. 4th 611 (2011) .......................................................................................... 13

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,
    100 Cal. App. 4th 44 (2002) ............................................................................................ 10

*Zalkind v. Ceradyne, Inc.*,
    194 Cal. App. 4th 1010 (2011) .......................................................................................... 9

**Federal Statutes**

42 U.S.C. § 2000a(a) ................................................................................................................ 6

47 U.S.C. § 230(c)(1) ....................................................................................................... *passim*

**State Statutes**

Cal. Civ. Code § 51(b) ............................................................................................................. 7

**Rules**

Fed. R. Civ. P. 15 .................................................................................................................... 13

**Constitutional Provisions**

U.S. Const. amend. I ....................................................................................................... *passim*

I.	INTRODUCTION

Plaintiff spends much of his opposition brief focused on what he wishes the law provided rather than grappling with what the law does provide. Among other things, he requests this Court reject settled case law holding that internet service platforms are immune from claims based upon their decisions to restrict content on their platforms. He requests this Court reject settled case law limiting the reach of Title II of the Civil Rights Act to physical places of public accommodation. He requests this Court reject settled case law holding that the First Amendment does not apply to non-state actors like Facebook. While Plaintiff may not feel bound by settled authority, this Court is. Plaintiff's medley of claims—seven in total—all ultimately fail in the face of constitutional or statutory immunities held by Facebook, protections Facebook secured by way of contract, or the simple fact that the allegations Plaintiff advances are not enough to state a claim. In the face of these hurdles, Plaintiff's lawsuit must be dismissed with prejudice and Facebook's separate Anti-SLAPP motion must be granted.

II.	**PLAINTIFF'S CONTENT-RESTRICTION CLAIMS ARE BARRED BY FEDERAL LAW**

Without considering the individual deficiencies in each claim, this Court can dispose of all of Plaintiff's content-restriction claims (Counts I, II, & III, Compl. ¶¶ 40–55) on two separate grounds: (1) 47 U.S.C. § 230(c)(1) of the Communications Decency Act ("CDA") prevents Plaintiff from challenging Facebook's decision with respect to his user-generated content; and (2) as a private actor, Facebook's editorial decisions are protected by the First Amendment.

A.	**CDA § 230(c)(1) Immunizes Facebook from Plaintiff's Content-Restriction Claims**

The Ninth Circuit has held that CDA § 230(c)(1) affords internet platforms like Facebook with "broad federal immunity to *any* cause of action that would make service providers liable for information originating with a third-party user of the service." *Perfect 10, Inc. v. CCBill LLC*, 481 F.3d 751, 767 (9th Cir. 2007) (emphasis added). Plaintiff offers two reasons why this broad immunity does not apply here. First, he argues, § 230 does not apply when the content at issue is posted by a party to the lawsuit as opposed to some third-party. Opp. at 6. Second, Plaintiff contends he is not seeking to hold Facebook liable as the publisher or speaker of any content. *Id*.

at 6–8.  Neither argument withstands scrutiny.

### 1.     CDA § 230 immunity applies when a party's own content is at issue.

Contrary to Plaintiff's suggestion, no court has held that the protections afforded under CDA § 230 are unavailable when the plaintiff's own content is at issue.  As the Ninth Circuit has noted, § 230(c)(1) immunity applies to a broad range of user-generated content.  It is not restricted based on whether the third-party content came from the plaintiff or another user, so long as the content is not created by the platform itself.  *See Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162–63 (9th Cir. 2008).  Not surprisingly, courts in this District repeatedly dismiss claims against interactive-computer-service providers—like Facebook—when they are sued by users who allege that their content has been improperly removed.  *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088 (N.D. Cal. 2015); *Lancaster v. Alphabet, Inc.*, 2016 WL 3648608, at *3 (N.D. Cal. July 8, 2016).

### 2.     CDA § 230 protects internet platforms that remove content

Plaintiff contends that the CDA does not apply when a defendant is accused of improperly *removing* content from a platform because the defendant, in that case, is not being treated as the publisher or speaker of another's content.  Plaintiff asserts that two on-point district court decisions applying CDA § 230 to the removal of content—*Sikhs for Justice v. Facebook, Inc.*, 144 F. Supp. 3d 1088 (N.D. Cal. 2015) and *Lancaster v. Alphabet Inc.*, 2016 WL 3648608 (N.D. Cal. July 8, 2016)—were wrongly decided.  Plaintiff is misguided.

*First*, the Ninth Circuit has rejected Plaintiff's narrow reading of the statute.  In *Barnes v. Yahoo!*, the court explained that CDA § 230 protects the exercise of a "publisher's traditional functions" such as "reviewing, editing, and deciding whether to publish *or to withdraw from publication* third-party content."  570 F.3d 1096, 1102 (9th Cir. 2009) (emphasis added).  "[R]emoving content is something publishers do."  *Id.* at 1103.  "[B]ecause such conduct is *publishing conduct* . . . we have insisted that section 230 protects from liability 'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online.'"  *Id*.

Notably, the two district court decisions that Plaintiff attacks—*Sikhs for Justice* and

*Lancaster*—cite the Ninth Circuit's decision in *Barnes* for support. *See Sikhs for Justice*, 144 F. Supp. 3d at 1094; *Lancaster*, 2016 WL 3648608 at *3. While the Ninth Circuit never reviewed *Lancaster* on appeal, it did review *Sikhs for Justice*. The District Court's decision was affirmed and the Ninth Circuit again cited its holding in *Barnes* for support. *See Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526, 526 (9th Cir. 2017). Thus, far from being anomalies, the courts' decisions in *Sikhs for Justice* and *Lancaster* were in line with settled Ninth Circuit precedent.

As explained in Facebook's opening brief, *Sikhs for Justice* and *Lancaster* make clear that any decision regarding what content should or should not appear on an internet platform constitutes the exercise of a "publisher's traditional editorial functions," *Barnes*, 570 F.3d at 1102, and is immune from the sorts of claims Plaintiff lodges here. Because Plaintiff's content-restriction claims all reduce to claims concerning what or whom Facebook would permit on its platform, they challenge core decisions protected by the CDA.[1]

### B. Instead of Being Regulated by the First Amendment (Count II), Facebook is Protected by it

#### 1. Facebook is not a state actor nor does it perform a "public function"

In its moving papers, Facebook cited numerous cases holding that internet platforms are not subject to the First Amendment because they are not state actors. MTD at 9. Plaintiff's Opposition cites no authority to the contrary. Instead, he encourages this Court to be the first court to hold that internet platforms are subject to the First Amendment because they are the new "public sidewalk, street, and park." Opp. at 10. But that is not and has never been the appropriate test. What matters is whether the function at issue has been "traditionally the *exclusive* prerogative of the State." *Brunette v. Humane Soc'y of Ventura Cty*, 294 F.3d 1205, 1214 (9th Cir. 2002). And under this narrow exception, a defendant hosting a website for sharing content does not "engage[] in one of the 'very few' functions that were traditionally 'exclusively reserved

---

[1] The Ninth Circuit's decision in *Roomates.com*, 521 F.3d at 1157 is not applicable to the facts here. In *Roomates*, the Ninth Circuit held that section 230's protections were unavailable because defendant itself helped create the illegal content at issue by requiring users to supply information in response to impermissible questions. *See id.* at 1166–67, 1176. In other words, the content at issue was not simply provided by a third party but was provided by defendant itself. There is no suggestion that Facebook played any role in shaping the content at issue here.

to the State.'" *Prager Univ. v. Google LLC*, 2018 WL 1471939, at *6 (N.D. Cal. Mar. 26, 2018) (citation omitted). This Court should follow settled precedent and hold that Plaintiff cannot state a First Amendment claim against Facebook.

**2.     As a private actor, Facebook is protected by the First Amendment**

Turning to the other side of the coin, Plaintiff cannot compel the government—this Court—to regulate Facebook's "exercise of editorial control and judgment" under the First Amendment. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 575 (1995). Citing the Supreme Court's decision in *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 653 (1994), which upheld the constitutionality of content-neutral regulations on cable operators, Plaintiff argues that the First Amendment does not apply because the anti-discrimination laws he is asserting are also "content neutral" and thus any impingement on Facebook's speech is merely "incidental." Opp. at 8–10.

*Zhang v. Baidu.com, Inc.* is squarely on point and explains why Plaintiff's arguments are unpersuasive. 10 F. Supp. 3d 433 (S.D.N.Y. 2014). In *Baidu*, the plaintiff alleged that the defendant, a search engine, violated federal and state laws barring discrimination based on race when it blocked anti-China websites from its search results. The court addressed whether the anti-discrimination laws were "content neutral" and thus could withstand First Amendment scrutiny. The court concluded that they could not. *Turner*, it explained, was distinguishable because it involved content neutral regulations—rules requiring cable stations to carry local broadcasting stations. By contrast, plaintiff was seeking to penalize Baidu "precisely because what it does and does not chose to say," namely what anti-Chinese websites it would permit in its search results. *Baidu*, 10 F. Supp. 3d at 441. The First Amendment prohibits such action.

As in *Baidu*, Plaintiff seeks to commandeer this Court into penalizing Facebook for choices allegedly made regarding what content and what speakers would be permitted on its platform. This penalty is inherently based on content and thus cannot withstand First Amendment scrutiny.

**C.     All of Plaintiff's Content-Restriction Claims Are Individually Deficient**

While Facebook believes that the CDA and the First Amendment dispose of all of

Plaintiff's content-restriction claims, Plaintiff's content-restriction claims fail on their own accord.

### 1.  Facebook's online platform is not regulated by Title II of the Civil Rights Act (Count I)

Notwithstanding the fact that the Ninth Circuit has limited the application of Title II of the Civil Rights Act to places that have a physical presence,[2] Plaintiff nevertheless urges this Court to ignore settled precedent and hold that Facebook is subject to Title II.  Because the First Circuit[3] has held that another anti-discrimination statute—Title III of the Americans with Disabilities Act ("ADA")—is not limited to physical locations, Plaintiff argues this Court should apply the same reasoning and expand Title II of the Civil Rights Act as well.  This Court should decline to do that for the following reasons:

***First***, as Plaintiff himself notes, Opp. at 13, the Ninth Circuit rejected the First Circuit's interpretation of Title III of the ADA in *Weyer v. Twentieth Century Fox Film Corp.*, concluding that Title III required "some connection between the good or service complained of and an actual physical place."  198 F.3d 1104, 1113 n.48, 1115 (9th Cir. 2000) (describing the First Circuit's reasoning as "expansive" and "questionable").[4]  Whatever qualms Plaintiff has with the logic in *Weyer*, it has not been revisited since then.  *See United States v. Easterday*, 564 F.3d 1004, 1010 (9th Cir. 2009) ("[A] panel opinion is binding on subsequent panels unless and until overruled by an en banc decision of this circuit."); *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1115–16 (N.D. Cal. 2011) (Under *Weyer*, "Facebook's internet services thus do not have a nexus to a physical place of public accommodation for which Facebook may be liable" under Title III of the ADA.).

***Second***, even if the Ninth Circuit had endorsed a broader interpretation of Title III of the

---

[2]  *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000); *Clegg v. Cult Awareness Network*, 18 F.3d 752, 755 (9th Cir. 1994).

[3]  *Carparts Distrib. Ctr., Inc. v. Automotive Wholesale's Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir. 1994).

[4]  The other two cases cited by Plaintiff concerning the scope of Title III of the ADA rely on *Carparts*.  *See Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999); *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 200–01 (D. Mass. 2012).

ADA, that would not call for a more expansive reading of Title II of the Civil Rights Act.  The *Carparts* court focused on the fact that Title III contained a more "ambiguous" listing of public accommodations, *e.g.*, a "travel service," that did not necessarily require physical entry into a facility.  37 F.3d 12 at 19 ("Beyond our threshold determination, we must tread with care.").  In comparison, Title II contains no equivalent language, *see* 42 U.S.C. § 2000a(a), nor does Plaintiff point to a textual equivalent.

*Finally*, Plaintiff points to the fact that Facebook has a physical office and technical infrastructure located in physical facilities.  *See* Opp. at 12.  That, however, is a distinction without a difference.  The fact that a web service is affiliated with physical locations does not matter if that physical location is not a "necessary predicate use" to using the web service.  *Clegg*, 18 F.3d at 756.  Billions of Facebook users, including Plaintiff, use the platform on a daily basis without interacting with Facebook's physical offices.  *See Noah v. AOL Time Warner Inc.*, 261 F. Supp. 2d 532, 545 (E.D. Va. 2003) ("[E]ven if plaintiff's Title II claim were not barred by § 230's grant of immunity to service providers, it would be fail on the independent ground that AOL's chat rooms are not places of public accommodation.").

### 2. Plaintiff fails to allege any in-state discrimination to state a viable Unruh Act claim (Count III)

#### a. Plaintiff seeks to use the Unruh Act extraterritorially

Plaintiff's Unruh Act claim must be dismissed because he, an Arizona resident, is not entitled to take advantage of the statute.  Plaintiff suggests the Unruh Act applies, reasoning that because Facebook's "principal offices are located in California," Facebook's decisions regarding its alleged actions were also made in California.  Opp. at 25.  Plaintiff rests this assertion on *Warner v. Tinder, Inc.*, 105 F. Supp. 3d 1083, 1096 (C.D. Cal. 2015).  But Plaintiff cites the *Warner* court's discussion about the extraterritorial application of the False Advertising Law and the Unfair Competition Law ("UCL"), not the Unruh Act.  With respect to the Unruh Act, the court dismissed the claim because the complaint did not allege that plaintiff suffered discrimination inside California, notwithstanding the fact the defendant's principal place of business was in California.  *Id*. at 1099.  Likewise, here, Plaintiff does not allege that he suffered

any discrimination within California.

Plaintiff also fails to address the decision in *Tat Tohumculuk, A.S. v. H.J. Heinz Co.*, 2013 WL 6070483, at *7 (E.D. Cal. Nov. 14, 2013). Although Plaintiff asserts that the "alleged discrimination was approved by defendants' officers in California," the Unruh Act was not held to apply to a plaintiff outside California because the statute itself is limited to access by "persons within the jurisdiction" of California and the "alleged discrimination [was] suffered by parties outside of California." *Id*. This Court should follow these decisions and dismiss Plaintiff's Unruh claim as not actionable.

### b. Alternatively, Plaintiff's Unruh Act claim fails because he alleges no intentional discrimination

Even if this Court concludes that the Unruh Act can be applied without violating its statutory prohibitions against extraterritoriality, Plaintiff's Unruh Act claim still fails because there is no allegation of intentional discrimination by Facebook. To allege an Unruh Act violation separate from the Civil Rights Act, a plaintiff must plead "intentional discrimination," *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014) (citation omitted), based on "sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, [or] sexual orientation . . . ." Cal. Civ. Code § 51(b). As explained below, Plaintiff fails to plead at least two of the elements required to plead intentional discrimination under the Unruh Act.

**The Complaint Does Not Mention a Protected Class**: The Complaint alleges that Plaintiff is Egyptian and that some of his posts, which were in Arabic, were removed. *See* Opp. at 17–18 (citing Compl. ¶¶ 10, 14 16, 34 54). However, Plaintiff does not specify whether Facebook's alleged discrimination was based on race, ancestry, national origin, or even political affiliation. Compl. ¶¶ 10, 14, 54. Such allegations are insufficient to bring an Unruh Act claim. *See Bowden v. Redwood Inst. for Designed Educ., Inc.*, 1999 WL 138889, at *4 (N.D. Cal. Mar. 9, 1999).

**No Motivating Reason Can Be Plausibly Inferred:** Even if one or multiple protected classes can be inferred from Plaintiff's allegations, the Complaint suffers from a more

fundamental defect: it does not allege that Facebook removed Plaintiff's content because of his membership in a protected class. In other words, there is no claim that Facebook took any action because of Plaintiff's Egyptian heritage, his posts in Arabic, or his political affiliations.

In his Opposition, Plaintiff suggests that a motivating reason can be inferred because of the "arbitrary" nature of Facebook's actions. Opp. at 17. But even assuming for the sake of argument that Facebook's actions were "arbitrary," that would not mean that Facebook acted with animus. Instead, Plaintiff would at best only allege that there was an error in Facebook's process, not that Facebook removed Plaintiff's content because he belonged to some protected class. *See Smith v. Pride Mobility Prods. Corp.*, 2016 WL 6393549, at *4 (N.D. Cal. Oct. 28, 2016) (concluding that a disabled plaintiff failed to allege discrimination based on an allegedly defective wheelchair lift because she did not allege that her disability motivated defendant to manufacture the lift).

At most, Plaintiff can only plausibly allege that he subjectively believed that Facebook intentionally discriminated. But a "plaintiff's own speculation that [a protected status] motivated defendant's action is not sufficient to establish" a claim of intentional discrimination. *Boarman v. Cty. of Sacramento*, 2013 WL 3894167, at *2 (E.D. Cal. July 26, 2013) (citing *Bass v. City of Fremont*, 2013 WL 891090, at *6 (N.D. Cal. Mar. 8, 2013)).

### III. PLAINTIFF'S "BOOSTING" CLAIMS SHOULD BE DISMISSED WITH PREJUDICE

In addition to complaining about Facebook's restrictions on his content, Plaintiff alleges that Facebook failed to "boost," or promote, two of his posts to enough other users. *See* Count IV, Count V, Count VI, and Count VII, Compl. ¶¶ 56–78. Each of these allegations fail to a state a claim for relief.

#### A. Facebook Did Not Breach Any Contractual Term (Count V)

For the first time in his Opposition brief, Plaintiff asserts the basis for his alleged breach of contract claim. He asserts that Facebook failed to use its "best efforts" to deliver two ads that he ordered on May 20 and May 30, 2018. Opp. at 19. He also asserts that Facebook gave him a contractual right to "express himself" but somehow breached that right through its content

restrictions and limitations. *Id.* Plaintiff's assertions fail to save this claim.

As an initial matter, neither of these allegations raised in Plaintiff's Opposition brief are in the Complaint. In fact, the breach of contract claim in the Complaint is expressly limited to the "boosting" allegations and makes no mention of any claim tied to contention restrictions. Compl. ¶¶ 64–68. As a result, the Court should not consider either assertion when assessing Plaintiff's breach of contract claim. *See McShannock v. JP Morgan Chase Bank N.A.*, 354 F. Supp. 3d 1063, 1069 (N.D. Cal. 2018) ("Plaintiffs cannot fix their pleading deficiencies by alleging new facts in their opposition brief.").

As for the claim that was alleged in the Complaint—that two of Plaintiff's posts were not "boosted" to as many people as expected (Compl. ¶¶ 35–39)—the contract bars this claim. The "meaning of a contract must be derived from reading the whole of the contract, with individual provisions interpreted together, in order to give effect to all provisions and to avoid rendering some meaningless." *Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1027 (2011). While Facebook's Self-Serve Ad Terms ("SSATs") stated that the company will use its "best efforts to deliver" an ad, Opp. at 19, this provision is limited by (1) Facebook's explicit disclaimer that it will not guarantee the results of any ad; and (2) Facebook's reservation of the right to "reject or remove an ad for any reason." *See* Dkt. No. 11, Motion to Dismiss and Anti-SLAPP Motion to Strike ("MTD") at 16 (citing SSAT #7 and #13). Even the portion of the SSATs that Plaintiff excerpts includes an express limitation that Facebook does not "guarantee in every instance that your ad will reach its intended target or achieve the outcome you select." Declaration of Victor H. Yu I/S/O Facebook's Motion to Dismiss ("Yu Decl.") Ex. E.[5]

In any event, Plaintiff's new-found theory that he had a contractual right to "express" himself fares no better. The provision quoted comes from Facebook's Terms of Service ("TOS") that went into effect in April 2018, *see* Yu Decl. Ex. A, and thus has no bearing on Plaintiff's content restriction claims, which date from early 2017 to February 2018. *See* Opp. at 2:11–2:27.

---

[5] In the TOS, Facebook "reserve[s] the right to reject, approve or remove any ad for any reason, in our sole discretion . . . ." Yu Decl. Ex. C. And Facebook's SSATs provide that: (1) Facebook has discretion to "determine the size, placement, and positioning" of an ad; (2) Facebook does not "guarantee the activity that your ads will receive"; and (3) Facebook "may reject or remove any ad for any reason." MTD at 16 (citing SSATs).

And even if this Court were to consider Plaintiff's new theory, the provision he quotes from is merely a general description of Facebook's products and services as "empower[ing] you to express yourself and communicate about what matters to you." *See* Yu Decl. Ex. A.  This is not an unqualified contractual obligation to permit users to say whatever they want.  Indeed, the TOS specifically notes that Facebook takes steps to limit the content on the platform.  *See id*. at § 1 ("We employ dedicated teams around the world and develop advanced technical systems to detect misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community.  If we learn of content or conduct like this, we will take appropriate action . . . ."). *See also* Yu Decl. Ex A at 4.2, at 3.2.[6]

### B. Facebook Cannot Breach Any Implied Covenant (Count VI)

Because Facebook's actions are "expressly authorized" by contract, there can be no breach of an implied covenant.  *See Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44, 55 (2002) ("[A]n implied covenant of good faith and fair dealing cannot contradict the express terms of a contract . . . ."); *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992) (same).

Citing *Way v. JP Morgan Chase Bank, N.A.*, 2018 WL 2117630, at *4 (E.D. Cal. May 8, 2018), Plaintiff notes that a breach of covenant claim may be brought without proving a breach of an express term.  But while an implied covenant claim can be maintained without the existence of an express term, if express terms do indeed exist and a defendant's actions are authorized by those terms—as is the case here—there can be no implied covenant claim.  This point was made in *Carma Developers*, the authority cited by *Way*, 2018 WL 2117630, at *4.  The *Carma Developers* court stated that an implied covenant cannot "be read to prohibit a party from doing that which is expressly permitted by an agreement." 2 Cal. 4th at 374.  After all, "implied terms should never be read to vary express terms." *Id*.  Because Facebook expressly contracted that it did not "guarantee the activity that your ad will receive," MTD at 16 (citing Yu Decl. Ex. D, Ex.

---

[6] To the extent Plaintiff is now asserting a breach of contract claim premised on the removal of his content, all of the arguments made above concerning the application of CDA § 230(c)(1) would apply, and any such claim should be dismissed with prejudice on that basis in addition to all of the other deficiencies noted here.

E), Plaintiff cannot vary that express term with an implied covenant.

### C. Plaintiff Has Failed to Properly Plead Fraud (Count IV)

Plaintiff alleges that because Facebook failed to boost his posts to the range of users he was expecting, Facebook defrauded him. Compl. ¶¶ 56–63. His allegations for fraud fail for three independent reasons:

*No Material Misrepresentation*: Plaintiff alleges only one representation by Facebook about his boosted posts: a notification by Facebook that his posts were being "boosted and published as an advertisement." *Id.* ¶ 38. Plaintiff concedes that the posts at issue were, in fact, "boosted" or run as advertisements. But Plaintiff complains that his ads did not reach as many people as he expected. *Id.* ¶¶ 37–38. Plaintiff fails to identify any representation by Facebook concerning how many people would see his boosted post because Facebook made no such representation. This is no surprise: Facebook does not guarantee an ad will reach a certain number of users and, in fact, disclaims any such guarantee. *See* Yu Decl. Ex. D (SSAT Nos. 6, 7, 13); Ex. E (SSAT Nos. 3, 6, 8). In short, there is no misrepresentation on which to base a fraud claim.

*No Scienter*: Even if the Complaint properly alleged that Facebook promised to boost Plaintiff's ads to the number of users Plaintiff desired, Plaintiff would still have not alleged any fraudulent intent by Facebook. To allege a fraud claim, "[s]omething more than nonperformance is required to prove the defendant's intent not to perform his promise." *Jones v. AIG Risk Mgmt., Inc.*, 726 F. Supp. 2d 1049, 1058 (N.D. Cal. 2010) (citing *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30 (1985)); *see J2 Cloud Servs., Inc. v. Fax87*, 2016 WL 6833904, at *3 (C.D. Cal. Nov. 18, 2016).

In his Opposition, Plaintiff points to only one theory of scienter: because Facebook "should know what ads have been boosted," Facebook's representations to Plaintiff were reckless. Opp. at 21. But even if Facebook promised to boost Plaintiff's posts to a larger number of users, Compl. ¶ 37, Facebook's alleged failure to live up to this fictitious promise would not necessarily be fraudulent. Without additional allegations of an intent to defraud, Plaintiff's allegations at most show that there was a *disagreement* over Facebook's obligations to Plaintiff.

Such a claim cannot give rise to an inference of scienter and certainly nothing that would transform a breach of contract claim into a tort claim.

*No Damages*: Damages in a fraud action must be "the direct result of the misrepresentation in question." *Shahangian v. Bank of Am. Nat'l Ass'n*, 2015 WL 12696038, at *4 (C.D. Cal. Dec. 1, 2015) (citing *Rockridge Tr. v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1164 (N.D. Cal. 2013)). Plaintiff now concedes that he "was not charged for the specific ads not boosted," Opp. at 22, and thus also effectively concedes that he suffered no harm tied to the allegedly "substantial sum of money" he regularly paid to boost his posts, Compl. ¶ 39. Instead, Plaintiff now suggests that Facebook's alleged fraud interfered with his "ability to promote and grow the ECL page." Opp. at 22. However, Plaintiff does not refer to any other damage—pecuniary or otherwise—related to his efforts to promote his page. Accordingly, Plaintiff has suffered no damages from Facebook's alleged fraud.

### D. Plaintiff's Derivate UCL Claim Must Also Be Dismissed (Count VII)

Because Plaintiff's UCL claim is entirely derivative of his other claims, *see* Compl. ¶¶ 76–77, his UCL claim must also be dismissed with prejudice for the reasons already addressed above.

### IV. THE COMPLAINT CANNOT STATE A CAUSE OF ACTION ON BEHALF OF THIRD PARTIES

As Facebook noted in its Motion to Dismiss at 11 n.2, Plaintiff cannot assert the "legal rights or interests of third parties." *Coal. of Clergy, Lawyers, & Professors v. Bush*, 310 F.3d 1153, 1163 (9th Cir. 2002). Without acknowledging this point, Plaintiff's Opposition again discusses allegations related to other users' content. *See, e.g.*, Opp. at 2, 10. Such claims are legally irrelevant and should be disregarded.

### V. PLAINTIFF'S UNRUH ACT AND PART OF HIS UCL CLAIM MUST BE STRIKEN UNDER CALIFORNIA'S ANTI-SLAPP LAW

Under California's Anti-SLAPP law, Facebook moves to strike Plaintiff's Unruh Act and part of his UCL claim as it relates to content-restriction. Every prong of the Anti-SLAPP statute is satisfied: (1) Facebook is a public forum for Anti-SLAPP purposes (but not for First

1  Amendment purposes); (2) Plaintiff targets an issue of public interest; (3) Plaintiff targets
2  expressive activity; and (4) Plaintiff cannot show a probability of success.  *See* MTD at 22–24.
3        In response, Plaintiff claims that the Complaint does not target expressive activity because
4  the "gravamen" of his Complaint alleges discrimination.  Opp. at 24.  He cites *Martin v. Inland*
5  *Empire Utilities Agency*, 198 Cal. App. 4th 611, 625 (2011), which held that an anti-SLAPP
6  motion was defective because the "gravamen" of plaintiff's Complaint centered on the
7  defendants' race and age-based retaliation, not to any speech made by the defendants.  *See id.*
8  ("Indeed, the board meeting [allegedly giving rise to discrimination] is mentioned only minimally
9  in plaintiff's pleadings.").  But here, Facebook's speech is not incidental to Plaintiff's action.  His
10 Unruh Act and UCL claims are premised directly on Facebook's decisions regarding the content
11 that it permits on its platform.  A suit that challenges a forum operator's editorial decisions seeks
12 to chill "conduct in furtherance of free speech rights and must withstand scrutiny under
13 California's anti-Slapp statute."  *Greater L.A. Agency on Deafness*, 742 F.3d at 424–25.
14       Finally, Plaintiff claims that this Court is required under Fed. R. Civ. P. 15(a) to grant
15 Plaintiff leave to amend, and alternatively, requests leave to submit additional materials.  Opp. at
16 25.  But Rule 15(a)(1) grants Plaintiff the right to amend only if he filed an amended Complaint
17 21 day after service, which he did not do here.  Otherwise, Rule 15(a)(2) requires Plaintiff to
18 obtain a stipulation or leave of court to amend.  Because all of Plaintiff's causes of action should
19 be dismissed with prejudice, Plaintiff should not be afforded leave to amend his Complaint.

## VI.  CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed with prejudice and Facebook's Anti-SLAPP Motion should be granted.

Dated: April 11, 2019

KEKER, VAN NEST & PETERS LLP

By: /s/ *Victor H. Yu*
PAVEN MALHOTRA
VICTOR H. YU

Attorneys for Defendant
FACEBOOK, INC.