1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SADEK RAOUF EBEID,

           Plaintiff,

    v.

FACEBOOK, INC,

           Defendant.

Case No.  18-cv-07030-PJH

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 11

      Defendant Facebook, Inc's ("Facebook") motion to dismiss came on for hearing before this court on May 1, 2019.  Plaintiff Sadek Raouf Ebeid appeared through his counsel, Behzad Vahidi.  Facebook appeared through its counsel, Paven Malhotra and Victor Yu.  Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS defendant's motion, for the following reasons.

**BACKGROUND**

      Plaintiff was born and raised in Cairo, Egypt, but is now a resident of Arizona.  Dkt. 1, Compl. ¶ 10.  Ebeid alleges he has long been involved in the political and national issues of Egypt.  Id. ¶ 11.  As part of that involvement, in August 2010, Ebeid created a public Facebook page, titled "Egypt-Cradle of Love" (the "ECL page").  Id. ¶ 13.  The purpose of that page "was to promote religious tolerance and the mutual acceptance of people of all faiths in Egypt and the Middle east."  Id.  Many of Ebeid's posts on the ECL public page were in Arabic.  Id. ¶ 14.

      The parties do not dispute that Facebook gives users the ability to "boost" their posts.  Id.  The boost feature allows users to turn posts that are otherwise free to publish

into advertisements that target specific demographics.  Id.  If a user decides to boost his posts, Facebook charges the user for each time the boosted post is actually displayed to other users.  Before the events that form the basis of this action, plaintiff regularly used Facebook's boost feature to promote posts on the ECL page.  Id.

In early 2017, Ebeid started an advertisement campaign on the ECL page calling for the recall of John Casson, the then-British Ambassador to Egypt.  Compl. ¶ 16.  As that campaign gained popularity, Ebied allegedly experienced repeated restrictions and interference by Facebook related to his ability to promote his campaign.  Id. ¶ 17.  According to plaintiff, all of Facebook's conduct "shared a common goal and outcome, which was prohibiting Dr. Ebeid from utilizing Facebook's public forum to exercise his right to free speech in supporting the Campaign[.]"  Id. ¶ 17.

Between March 2017 and August 2017, plaintiff and other administrators of the ECL page published and boosted numerous posts in support of ECL's campaign advocating for the recall of Casson.  Id. ¶¶ 18-21.  Facebook allegedly responded to that campaign by removing some of those and restricting or suspending plaintiff's and the other administrators' access to the Facebook platform or certain of its features.  Id.  In August 2017, Facebook suspended Ebeid's personal Facebook page for 30 days.  Id.

In response to the restrictions imposed by Facebook, in September 2017, two people created a Facebook group called "Friends of Dr. Sadek Raouf Ebeid" (the "Friends of Ebeid page").  Id. ¶ 22.  Over the next several months, Ebeid and others shared posts from the ECL page on their own personal Facebook pages and on the Friends of Ebeid page.  Id. ¶ 23.  In December 2017, Facebook notified Ebeid that sharing posts from the ECL page would result in Facebook restricting Ebeid's use of the Facebook platform.  Id. ¶ 24.  Between September 2017 and February 2018, Facebook restricted Ebeid from posting or joining any Facebook group—including the Friends of Ebeid group—approximately 16 times.  Id. ¶ 28.  Though Facebook removed the restriction each time Ebeid appealed the decision to restrict his access, Facebook nevertheless restricted plaintiff's access again, sometimes as early as the next day.  Id.

2

United States District Court
Northern District of California

During the same time period, Facebook allegedly removed numerous posts made by plaintiff on the Friends of Ebeid page and the ECL page.  Compl. ¶¶ 29-33.  On at least five occasions, Facebook removed the posts after labeling them as "spam."  Id. Though Facebook reversed its decision after Ebeid challenged Facebook's removal of the posts, Facebook subsequently continued to remove similar posts as "spam."  Id. ¶ 33. According to the complaint, Facebook removed Ebeid's posts and restricted "his access solely to interfere with his ability to campaign for the recall of the British Ambassador."  Id. ¶ 34.

Lastly, plaintiff alleges that throughout the months of April and May 2018, Facebook told plaintiff that his posts were being boosted as requested, when in fact that was not the case.  Id. ¶¶ 35-38.  Plaintiff's sole support for this allegation is that plaintiff's past boosted posts had reached about 100,000 Facebook users, while Ebeid's April and May posts, which were similar in content and targeted demographic to the past posts, reached only a nominal number of users.  Id. ¶¶ 35-37.  Plaintiff complains that those disparate results can only be attributed Facebook's failure to boost the posts, despite its representations to the contrary.  Id. ¶ 38.  Importantly, plaintiff does not contend that he was charged for posts that were not actually boosted or seen by other Facebook users. Instead, plaintiff alleges that he was somehow harmed by Facebook's interference with his ability to use the page to promote his "ideas and message."  Id. ¶ 39.

Based on those allegations, plaintiff alleges seven causes of action for: (i) violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, et seq. ("Title II"); (ii) violation of the First Amendment of the U.S. Constitution; (iii) violation of California's Unruh Civil Rights Act, Cal. Civ. Code §§ 51 et seq. (the "UCRA" or "Unruh Act"); (iv) fraud and/or intentional misrepresentation; (v) breach of contract; (vi) breach of the implied covenant of good faith and fair dealing; and (vii) violation of California's Unlawful Business Practices Act, Cal. Bus. & Prof. Code § 17200 et seq. (the "UCL").

Defendant now moves to dismiss.

**DISCUSSION**

**A.     Legal Standard**

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint.  Ileto v. Glock, 349 F.3d 1191, 1199–1200 (9th Cir. 2003). Under Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a complaint may be dismissed under Rule 12(b)(6) if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory.  Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).

While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted.  Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009).  The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 558–59 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.' "  Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment.  Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

The court's review is generally limited to the contents of the complaint, although the court can also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading."  Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005); see also Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007).  The court may also consider matters that are properly the subject of judicial notice, Lee v. City of L.A., 250 F.3d 668, 688–89 (9th Cir. 2001), exhibits attached to the complaint, Hal Roach Studios, Inc. v.

4

1  *Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and documents

2  referenced extensively in the complaint and documents that form the basis of the

3  plaintiff's claims, No. 84 Emp'r-Teamster Jt. Counsel Pension Tr. Fund v. Am. W. Holding

4  Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

5         For plaintiff's claims that sound in fraud, the complaint must also meet the

6  heightened pleading standard of Federal Rule of Civil Procedure 9(b).  See Kearns v.

7  Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009).  Rule 9(b) requires a party alleging

8  fraud or mistake to state with particularity the circumstances constituting fraud or mistake.

9  "To satisfy Rule 9(b)'s particularity requirement, the complaint must include an account of

10  the time, place, and specific content of the false representations as well as the identities

11  of the parties to the misrepresentations."  Depot, Inc. v. Caring for Montanans, Inc., 915

12  F.3d 643, 668 (9th Cir. 2019) (internal quotation marks omitted).

13  **B.**  **Analysis**

14      **1.**  **The Communications Decency Act Immunizes Facebook From**

15          **Liability For Counts I-III and In Part For Count VII**

16         Defendant first argues that § 230 of the Communications Decency Act (the "CDA")

17  immunizes it from plaintiff's Title II claim, First Amendment claim, UCRA claim, and part

18  of the UCL claim (together, the "content-based-restriction claims").  According to

19  defendant, it is immune from those claims because they essentially seek to hold

20  Facebook liable for restricting what plaintiff can post on the Facebook platform.  The

21  court agrees.

22         "Section 230 immunizes providers of interactive computer services against liability

23  arising from content created by third parties."  Fair Hous. Council of San Fernando Valley

24  v. Roommates.Com, LLC ("Roommates"), 521 F.3d 1157, 1162 (9th Cir. 2008) (en

25  banc)).  Under § 230(c)(1), "[n]o provider or user of an interactive computer service shall

26  be treated as the publisher or speaker of any information provided by another information

27  content provider."  47 U.S.C. § 230(c)(1).  Accordingly, the CDA bars plaintiff's content-

28  based-restriction claims if "(1) [the] Defendant is a 'provider or user of an interactive

1   computer service;' (2) the information for which Plaintiff seeks to hold defendant liable is

2   'information provided by another information content provider;' and (3) Plaintiff's claim

3   seeks to hold Defendant liable as the 'publisher or speaker' of that information." Sikhs for

4   Justice "SFJ", Inc. v. Facebook, Inc., 144 F. Supp. 3d 1088, 1092-93 (N.D. Cal. 2015)

5   (quoting § 230), aff'd sub nom. Sikhs for Justice, Inc. v. Facebook, Inc., 697 F. App'x 526

6   (9th Cir. 2017).

7                 **a.**       **Interactive Computer Service**

8          Consistent with numerous prior decisions, plaintiff does not dispute that defendant

9   qualifies as an "interactive computer service." See e.g., Id.; Fraley v. Facebook, Inc., 830

10  F. Supp. 2d 785, 801–02 (N.D. Cal. 2011).  This court agrees.

11                **b.**       **Information Provided by Another Information Content Provider**

12         Plaintiff argues that the information at issue was not provided by another

13  information content provider because plaintiff himself—not some other third-party—

14  provided the information.  That argument has been repeatedly rejected.

> [T]he CDA precludes publisher liability against an interactive computer service for content created by "another information content provider."  47 U.S.C. § 230(c)(1).  An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." Id. § 230(f)(3).  "The reference to 'another information content provider'. . . distinguishes the circumstance in which the interactive computer service itself meets the definition of 'information content provider' with respect to the information in question." Batzel v. Smith, 333 F.3d 1018, 1031 (9th Cir. 2003); see also Perkins, 53 F. Supp. 3d at 1246 (noting that § 230's "grant of immunity only applies if the interactive computer service provider is not also an 'information content provider' " (quoting Roommates, 521 F.3d at 1162)).  In other words, the CDA immunizes an interactive computer service provider that "passively displays content that is created entirely by third parties," but not an interactive computer service provider that acts as an information content provider by creating or developing the content at issue. Roommates, 521 F.3d at 1162.  Put another way, "third-party content" is used to refer to content created entirely by individuals or entities other than the interactive computer service provider. See id.

SFJ, 144 F. Supp. 3d at 1093–94.

1    Essentially, plaintiff reads "third-party" into a statute that only requires "another"

2    party, which plaintiff certainly qualifies as.  See also Lancaster v. Alphabet Inc., No. 15-

3    CV-05299-HSG, 2016 WL 3648608, at *3 (N.D. Cal. July 8, 2016) (holding that plaintiff's

4    own content satisfied second prong of the CDA immunity test).

5                   c.       Treatment As A Publisher

6    Defendant contends that plaintiff's content-based-restriction claims stem from

7    defendant's decision to remove plaintiff's posts or restrict plaintiff's ability to publish new

8    posts.  According to defendant, such acts are traditional publisher functions protected by

9    the CDA.  Plaintiff argues that the content-based-restriction claims allege discrimination

10   and, therefore, do not seek to hold defendant liable as the publisher or speaker of the

11   information at issue.  The court again agrees with defendant.

12   In determining whether the CDA immunizes a defendant from liability, the court

13   must look to "whether the cause of action inherently requires the court to treat the

14   defendant as the 'publisher or speaker' of content provided by another," "not the name of

15   the cause of action."  Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1101-02 (9th Cir. 2009), as

16   amended (Sept. 28, 2009).  "[C]ourts must ask whether the duty that the plaintiff alleges

17   the defendant violated derives from the defendant's status or conduct as a 'publisher or

18   speaker.'  If it does, section 230(c)(1) precludes liability."  Id. at 1102.

19   "[P]ublication involves reviewing, editing, and deciding whether to publish or to

20   withdraw from publication third-party content."  Id.  Thus, "a publisher . . . decides

21   whether to publish" "material submitted for publication."  Id.  It is "immaterial whether this

22   decision comes in the form of deciding what to publish in the first place or what to remove

23   among the published material."  Id. at 1102 n. 8.  "[A]ny activity that can be boiled down

24   to deciding whether to exclude material that third parties seek to post online is perforce

25   immune under section 230."  Roommates, 521 F.3d at 1170–71.

26   Here, defendant's decision to remove plaintiff's posts undoubtedly falls under

27   "publisher" conduct.  See SFJ, 144 F. Supp. 3d at 1095; Lancaster, 2016 WL 3648608, at

28   *3 ("CDA precludes as a matter of law any claim arising from defendants' removal of

plaintiff's videos").  The same is true for Facebook's on-and-off again restriction of

plaintiff's use of and ability to post on the Facebook platform.  That conduct can be

"boiled down to deciding whether to exclude material that third parties seek to post

online."  Roommates, 521 F.3d at 1170–71; Riggs v. MySpace, Inc., 444 F. App'x 986,

987 (9th Cir. 2011) ("Section 230(c)(1) immunizes "decisions to delete [plaintiff's] user

profiles.");  Fields v. Twitter, Inc., 200 F. Supp. 3d 964, 972 (N.D. Cal. 2016) (finding that

Twitter's decision to allow ISIS to have accounts qualified as publisher activity under §

230); Gonzalez v. Google, Inc., 282 F. Supp. 3d 1150, 1166 (N.D. Cal. 2017) (similar).

Lastly, the Ninth Circuit has rejected plaintiff's argument that CDA immunity does

not apply to Title II claims.  Sikhs for Justice, Inc., 697 F. App'x at 526 ("[W]e have found

no authority, and SFJ fails to cite any authority, holding that Title II of the Civil Rights Act

of 1964 provides an exception to the immunity afforded to Facebook under the CDA.");

see also SFJ, 144 F. Supp. 3d at 1095 (holding CDA immunized defendant from Title II

liability despite allegation that defendant engaged in "blatant discriminatory conduct";

affirmed by Sikhs for Justice, 697 F. App'x at 526).  This court sees no reason why

plaintiff's UCRA claim and plaintiff's UCL claim, to the extent it is based on discrimination,

should be treated differently.  See Riggs, 444 F. App'x at 987 (CDA immunizes defendant

from state causes of action); see Nat'l Ass'n of the Deaf v. Harvard Univ., No. 3:15-CV-

30023-KAR, 2019 WL 1409302, at *10 (D. Mass. Mar. 28, 2019) ("Federal and state

antidiscrimination statutes are not exempted" from the CDA. (citing § 230(e)).).

### d.   CDA Conclusion

Accordingly, because CDA immunity applies, the court DISMISSES causes of

action I-III WITH PREJUDICE.  In addition, plaintiff's UCL claim is DISMISSED WITH

PREJUDICE to the extent it relies on allegations that defendant removed plaintiff's posts

or restricted his ability to use the Facebook platform.

### 2.   Plaintiff's Complaint Does Not State A Claim

### a.   Plaintiff Has Failed To State A Title II Claim

Section 2000a(a) of Title II states: "All persons shall be entitled to the full and

equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."  42 U.S.C. § 2000a(a).

Plaintiff has failed to state a Title II claim for multiple reasons.  First, plaintiff has not adequately alleged that Facebook's conduct was based on plaintiff's "race, color, religion, or national origin."  While the complaint alleges plaintiff's national origin, Compl. ¶ 10, other than a conclusory allegation that mirrors the language of § 2000a(a), the FAC does nothing to connect that national origin to Facebook's alleged conduct.  The same goes for allegations about plaintiff's use of Arabic on the Facebook platform.  Indeed, the complaint's allegations suggest that, if anything, Facebook denied plaintiff access to its services based on plaintiff's views about the then-British Ambassador to Egypt.  See Compl. ¶ 34 ("Facebook was removing [Ebeid's] posts and restricting his access solely to interfere with his ability to campaign for the recall of the British Ambassador.");  see also id. ¶ 17.

Second, Facebook is not a public accommodation covered by Title II.  The Ninth Circuit has held that Title II "covers only places, lodgings, facilities and establishments." Clegg v. Cult Awareness Network, 18 F.3d 752, 756 (9th Cir. 1994) (holding that a national organization was not sufficiently connected to a "place" open to the public). Section 2000a(b)'s catchall provision, subsection (b)(4), "emphasizes the importance of physical presence by referring to any 'establishment . . . which is physically located within' an establishment otherwise covered, or 'within . . . which' an otherwise covered establishment 'is physically located.'"  Noah v. AOL Time Warner, Inc., 261 F. Supp. 2d 532, 541 (E.D. Va. 2003) (quoting § 2000a(b)(4); emphasis and ellipses in original), aff'd sub nom. Noah v. AOL-Time Warner, Inc., No. 03-1770, 2004 WL 602711 (4th Cir. Mar. 24, 2004) (finding chat rooms are not "public accommodations").  Though plaintiff points to the physical location of Facebook's servers, plaintiff's use of and the service provided by Facebook's online platform "is unconnected to entry into a public place or facility" and

9

1    therefore "the plain language of Title II makes the statute inapplicable." Clegg, 18 F.3d at

2    756 (offering goods or services is insufficient without evidence that the "goods or services

3    are sold, purchased, performed or engaged in from any public facility or establishment").

4         For each of those reasons, plaintiff has failed to state a Title II claim.

5         **b.    Plaintiff Has Failed To State A First Amendment Claim**

6         Plaintiff argues that Facebook has violated his First Amendment rights by

7    regulating his speech in a public forum.  Though plaintiff concedes that Facebook is a

8    private entity, he nevertheless argues that Facebook can be held liable under the public

9    function test, which, when satisfied, treats private entities as state actors.

10        Under the public function test, "[p]rivate activity becomes a 'public function' only if

11   that action has been 'traditionally the exclusive prerogative of the State.' " Brunette v.

12   Humane Soc'y of Ventura Cty., 294 F.3d 1205, 1214 (9th Cir. 2002) (quoting Rendell-

13   Baker v. Kohn, 457 U.S. 830, 842 (1982)).  The Supreme Court has stated that "[w]hile

14   many functions have been traditionally performed by governments, very few have been

15   exclusively reserved to the State." Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 158 (1978)

16   (internal quotation marks omitted).  Examples of functions that have been deemed to be

17   "traditionally the exclusive prerogative of the State" include "hold[ing] [public] elections,"

18   "govern[ing] a town," and "serv[ing] as an international peacekeeping force." Brunette,

19   294 F.3d at 1214.  It is this "exclusivity" that plaintiff fails to show applies to Facebook's

20   regulation of speech on its platform. See Prager Univ. v. Google LLC, No. 17-CV-06064-

21   LHK, 2018 WL 1471939, at *8 (N.D. Cal. Mar. 26, 2018) (collecting cases that have

22   declined to treat private social media corporations as state actors for regulating content

23   on their websites).

24        Because Facebook is a private entity and because plaintiff has failed to show that

25   Facebook should be treated as a state actor, plaintiff has failed to state a First

26   Amendment claim. Hudgens v. N.L.R.B., 424 U.S. 507, 513 (1976) ("[T]he constitutional

27   guarantee of free speech is a guarantee only against abridgment by government, federal

28   or state.").

United States District Court
Northern District of California

### c.      Plaintiff Has Failed To State A UCRA Claim

The UCRA provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, . . . [or] primary language . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).  "The California Supreme Court has clarified that the Unruh Act contemplates willful, affirmative misconduct on the part of those who violate the Act[.]"  Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc., 742 F.3d 414, 425 (9th Cir. 2014) (internal quotation marks omitted).  Plaintiff must prove "intentional discrimination" in violation of the terms of the Act.  Id.

Plaintiff has failed to state a UCRA claim for at least two reasons.  First, as discussed above, plaintiff has not adequately alleged that Facebook's conduct was animated by discriminatory intent.  And plaintiff's contention that Facebook's actions were "arbitrary" undermines, rather than supports, his UCRA claim—no inference of discrimination arises from assertions of arbitrariness.  Second, application of the Unruh Act is limited to "persons within the jurisdiction of" California who have suffered harm therein.  Tat Tohumculuk, A.S. v. H.J. Heinz Co., No. CIV 13-0773 WBS KJN, 2013 WL 6070483, at *7 (E.D. Cal. Nov. 14, 2013) (rejecting argument that the UCRA applied because discrimination was approved by defendants' officers within California); Warner v. Tinder Inc., 105 F. Supp. 3d 1083, 1099 (C.D. Cal. 2015) (same; collecting cases).  Plaintiff is a resident of Arizona, Compl. ¶ 8, but has not even asserted that the alleged discrimination took place while he was in California.

For each of those reasons, plaintiff has failed to state a UCRA claim.

### d.      Plaintiff Has Failed to State A Claim for Breach of Contract Or Fraud/Intentional Misrepresentation

Plaintiff's breach of contract and fraud claims are premised on Facebook's alleged "fail[ure] to boost Dr. Ebeid's posts despite [Facebook] notifying Dr. Ebeid that the posts

United States District Court
Northern District of California

have in fact been boosted."  Compl. ¶ 67; id. ¶¶ 58-62.[1]

    To plead a claim for breach of contract under California law, a plaintiff must allege:
"(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance;
(3) defendant's breach; and (4) damages to plaintiff as a result of the breach."  Appling v.
Wachovia Mortg., FSB, 745 F. Supp. 2d 961, 974 (N.D. Cal. 2010) (quoting CDF
Firefighters v. Maldonado, 158 Cal. App. 4th 1226, 1239 (2008)).  To plead a fraud claim
under California law, a plaintiff must allege "(a) misrepresentation (false representation,
concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to
defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."
Engalla v. Permanente Med. Grp., Inc., 15 Cal. 4th 951, 974 (1997), as modified (July 30,
1997) (internal quotation marks omitted); see also Manderville v. PCG&S Grp., Inc., 146
Cal. App. 4th 1486, 1498 (2007) (enumerating similar elements for the tort of intentional
misrepresentation).

    Plaintiff has failed to state a claim under either theory.  First, plaintiff's contract
claim fails because "[i]n an action for breach of a written contract, a plaintiff must allege
the specific provisions in the contract creating the obligation the defendant is said to have
breached."  Young v. Facebook, Inc., 790 F. Supp. 2d 1110, 1117 (N.D. Cal. 2011).  The
complaint does not allege which contract Facebook allegedly breached, much less the
breach of a specific provision therein.

    Second, plaintiff does not allege that Facebook failed to perform its obligations
under the contract.  Assuming the complaint attempts to allege a breach of Facebook's
Self-Serve Ad Terms (the "SSAT"), the SSAT specifically reserved Facebook's right to
"reject or remove any ad for any reason" and states that Facebook does "not guarantee

---

[1] Plaintiff's opposition asserts two new theories of liability that were not alleged in the complaint.  Those allegations, even if assumed sufficient, cannot provide a basis for defeating defendant's Rule 12(b)(6) motion.  Broam v. Bogan, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers[.]" (emphasis in original)).

1  the activity that [ ] ads will receive[.]"  Dkt. 11-5, Ex. D ¶¶ 7, 13; Dkt. 11-6, Ex. E ¶¶ 3, 8.[2]

2  For similar reasons, plaintiff has not adequately alleged a misrepresentation supporting

3  his fraud claim.  <u>Depot</u>, 915 F.3d at 668 (Rule 9(b) requires the complaint to "include an

4  account of the time, place, and specific content of the false representations[.]" (internal

5  quotation marks omitted)).

6          Third, plaintiff's breach of contract and fraud claims fail because plaintiff has not

7  alleged damages that occurred as a result of the breach or alleged misrepresentation.

8  As noted above, plaintiff does not allege that he was charged for ads that were not

9  boosted.  Further, at the hearing on this motion, plaintiff's counsel was unable to

10  articulate an alternative basis for harm tied to Facebook's alleged failure to adequately

11  boost plaintiff's posts.  As to the fraud claim, plaintiff's allegations of harm fall far short of

12  the particularity required by Rule 9(b).  <u>See</u> Compl. ¶¶ 39, 62 (conclusorily alleging

13  harm); <u>Shahangian v. Bank of Am. Nat'l Ass'n</u>, No. CV15-1919 DMG (MRWX), 2015 WL

14  12696038, at *4 (C.D. Cal. Dec. 1, 2015) ("[A] plaintiff must plead facts suggesting that

15  the damages in question were the direct result of the misrepresentation in question.").

16          For each of the above reasons, the court DISMISSES plaintiff's fraud and breach

17  of contract claims.

18          **e.    Plaintiff Has Failed To State a Claim for Breach of Implied**

19                  **Covenant of Good Faith and Fair Dealing Claim**

20          Under California law, "[t]here is implied in every contract a covenant by each party

21  not to do anything which will deprive the other parties thereto of the benefits of the

22  contract."  <u>Harm v. Frasher</u>, 181 Cal. App. 2d 405, 417 (Cal. Ct. App. 1960).  To state a

23  claim for breach of the implied covenant of good faith, a plaintiff must show "that the

24  conduct of the defendant, whether or not it also constitutes a breach of a consensual

25  contract term, demonstrates a failure or refusal to discharge contractual responsibilities,

---

[2] Plaintiff does not dispute the authenticity of or Facebook's reliance upon the SSAT documents.

1    prompted . . . by a conscious and deliberate act." <u>Careau & Co. v. Security Pacific</u>

2    <u>Business Credit, Inc.</u>, 222 Cal. App. 3d 1371, 1395 (Cal. Ct. App. 1990).  Further, "a party

3    cannot be held liable on a bad faith claim for doing what is expressly permitted in the

4    agreement."  <u>Solomon v. N. Am. Life & Cas. Ins. Co.</u>, 151 F.3d 1132, 1137 (9th Cir.

5    1998).

6         Here, plaintiff's claim fails because it is premised on the allegation that Facebook

7    "did not boost [plaintiff's] posts," Compl. ¶ 72—conduct that the contract expressly

8    permits.

9         Plaintiff's papers alternatively contend that "Facebook's discriminatory actions"—

10   removing posts and restricting plaintiff's use of the Facebook platform—"have interfered

11   with [plaintiff's] ability to grow and promote the ECL page and his campaign, and thus

12   [Facebook] has failed to exercise" its contractual right to remove or disapprove any post

13   in good faith.  That theory fails to support plaintiff's breach of implied covenant claim for

14   two reasons.  First, as discussed above, plaintiff has not adequately alleged that

15   Facebook's actions were discriminatory.  Second, as with the theory actually alleged in

16   the complaint, plaintiff has conceded that Facebook had the contractual right to remove

17   or disapprove any post or ad at Facebook's sole discretion.

18        For those reasons, plaintiff has failed to state a breach of implied covenant of good

19   faith claim.

20              **f.      Plaintiff Has Not Stated a UCL Claim**

21        Plaintiff's UCL claim relies solely upon the UCL's "unlawful" prong.  Compl. ¶ 77.

22   Because plaintiff has failed to state a predicate violation, plaintiff's UCL claim also must

23   be dismissed.  <u>See Krantz v. BT Visual Images, LLC</u>, 89 Cal. App. 4th 164, 178 (2001).

24                         **CONCLUSION**

25        For the foregoing reasons, the court GRANTS defendant's motion.  Plaintiff's first,

26   second, and third causes of action are DISMISSED for failure to state a claim and,

27   additionally, because the CDA immunizes defendant from liability, those causes of action

28   are DISMISSED WITH PREJUDICE.  Plaintiff's fourth, fifth, and sixth causes of action

United States District Court
Northern District of California

14

1   are DISMISSED WITHOUT PREJUDICE for failure to state a claim.  However, if plaintiff

2   chooses to amend any of those three claims, plaintiff's amended complaint shall include

3   specific allegations about the relevant contractual provision and the alleged

4   misrepresentations.  In addition, any amended complaint shall allege a specific harm not

5   dependent on defendant's alleged failure to adequately boost plaintiff's posts.  Plaintiff's

6   seventh cause of action for unfair competition under § 17200 is DISMISSED WITH

7   PREJUDICE to the extent it relies on causes of action one through three and to the

8   extent it relies on defendant's alleged failure to adequately boost plaintiff's posts.  In all

9   other respects, it is DISMISSED WITHOUT PREJUDICE.

10          Plaintiff's amended complaint, if any, shall be filed no later than May 31, 2019.  No

11   new parties or claims may be added without defendant's consent or leave of court.

12          Because this is plaintiff's first complaint and because the court is giving plaintiff

13   leave to amend in part, defendant's anti-SLAPP motion is DENIED without prejudice.

14   Verizon Delawarem Inc. v. Covad Communications. Co., 377 F.3d 1081, 1091 (9th Cir.

15   2004) ("[G]ranting a defendant's anti–SLAPP motion to strike a plaintiff's initial complaint

16   without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P.

17   15(a)'s policy favoring liberal amendment.").

18          **IT IS SO ORDERED.**

19   Dated: May 9, 2019

20   _____

21   PHYLLIS J. HAMILTON
     United States District Judge

22

23

24

25

26

27

28

United States District Court
Northern District of California